CALIFORNIA DIVISION OF LABOR STANDARDS
ENFORCEMENT ET AL. *v.* DILLINGHAM
CONSTRUCTION, N. A., INC., ET AL.

No. 95–789.   Argued November 5, 1996—Decided February 18, 1997

John M. Rea argued the cause for petitioners. With him on the briefs were *Vanessa L. Holton, Fred D. Lonsdale, Sarah Cohen*, and *H. Thomas Cadell, Jr.*

James A. Feldman argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Deputy Solicitor General Kneedler, J. Davitt McAteer, Allen H. Feldman, Nathaniel I. Spiller*, and *Edward D. Sieger.*

Richard N. Hill argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Washington et al. by *Christine O. Gregoire*, Attorney General of Washington, and *Lynn D. W. Hendrickson* and *Jeff B. Kray*, Assistant Attorneys General, *Dennis C. Vacco*, Attorney General of New York, *Victoria A. Graffeo*, Solicitor General, and *Daniel F. De Vita* and *M. Patricia Smith*, Assistant Attorneys General, *Winston Bryant*, Attorney General of Arkansas, *M. Jane Brady*, Attorney General of Delaware, *Charles F. C. Ruff*, Corporation Counsel for the District of Columbia, *Margery S. Bronster*, Attorney General of Hawaii, *Andrew Ketterer*, Attorney General of Maine, *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Scott Harshbarger*, Attorney General of Massachusetts, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Joseph P. Mazurek*, Attorney General of Montana, *Frankie Sue Del Papa*, Attorney General of Nevada, *Deborah T. Poritz*, Attorney General of New Jersey, *Theodore R. Kulongoski*, Attorney General of Oregon, and *Thomas W. Corbett, Jr.*, Attorney General of Pennsylvania; for the American Federation of Labor and Congress of Industrial Organizations et al. by *Jonathan P. Hiatt, Laurence J. Cohen, Terry R. Yellig, Laurence Gold, Marsha S. Berzon*, and *Donald J. Capuano;* for the California Association of the Sheet Metal and Air Conditioning Contractors National Association et al. by *Robert E. Jesinger;* for the Council of State Governments et al. by *Richard Ruda* and *Lee Fennell;* and for the National Electrical Contractors Association, Inc., by *Gary L. Lieber.*

Briefs of *amici curiae* urging affirmance were filed for Associated Builders and Contractors, Inc., et al. by *Mark R. Thierman;* and for Signatory Members of the Coalition to Preserve ERISA Preemption by *Maurice Baskin.*

Briefs of *amici curiae* were filed for the American Association of Retired Persons et al. by *Mary Ellen Signorille, Cathy Ventrell-Monsees,*

JUSTICE THOMAS delivered the opinion of the Court.

The State of California requires a contractor on a public works project to pay its workers the prevailing wage in the project's locale. An exception to this requirement permits a contractor to pay a lower wage to workers participating in an approved apprenticeship program. This case presents the question whether the pre-emption provision of the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, as amended, 29 U. S. C. § 1001 *et seq.*, supersedes California's prevailing wage law to the extent that the law prohibits payment of an apprentice wage to an apprentice trained in an unapproved program. We conclude that California's law does not "relate to" employee benefit plans, and thus is not pre-empted.

## I

## A

Since 1931, the Davis-Bacon Act, 46 Stat. 1494, as amended, 40 U. S. C. §§ 276a to 276a–5, has required that the wages paid on federal public works projects equal wages paid in the project's locale on similar, private construction jobs. California, in 1937, adopted a similar statute, which requires contractors who are awarded public works projects to pay their workers "not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed." Cal. Lab. Code Ann. § 1771 (West 1989). Under both the Davis-Bacon Act and California's prevailing wage law, public works contractors may pay less than the prevailing journeyman wage to apprentices in apprenticeship programs that meet standards promulgated under the National Apprenticeship Act, 50 Stat.

*Melvin Radowitz,* and *Daniel Feinberg;* for the Associated General Contractors of America, San Diego Chapter, Inc., et al. by *John G. Roberts, Jr., Michael E. Kennedy, William. G. Jeffery,* and *David P. Wolds;* for the California Apprenticeship Coordinators Association et al. by *James P. Watson;* and for the Chamber of Commerce of the United States et al. by *Timothy B. Dyk, Daniel H. Bromberg, Stephen A. Bokat, Mona C. Zeiberg, Jan S. Amundson,* and *Quentin Riegel.*

664, as amended, 29 U. S. C. §50 (known popularly as the Fitzgerald Act).[1]   See 29 CFR §29.5(b)(5) (1996); Cal. Lab. Code Ann. §1777.5 (West 1989 and Supp. 1997).   In most circumstances, California public works contractors are not obliged to employ apprentices, but if they do, the apprentice wage is only permitted for those apprentices in approved programs.

The federal arbiter of apprenticeship program adequacy is the Bureau of Apprenticeship and Training (BAT), located within the Department of Labor.   An apprenticeship program that seeks to provide federal public works contractors with apprentice-wage-eligible apprentices must receive the blessing of either the BAT or a "State Apprenticeship Agency."   29 CFR §29.3 (1996).   Since 1978, California's state apprenticeship agency, the California Apprenticeship Council (CAC), has been authorized under 29 CFR §29.12 to approve apprenticeship programs for federal purposes. App. 37.   California has also charged the CAC with approving apprenticeship programs for purposes of California's prevailing wage statute.   See Cal. Lab. Code Ann. §3071 (West 1989).   Pursuant to the Fitzgerald Act, the United States Secretary of Labor has promulgated apprenticeship program standards.   29 CFR §29.5 (1996).   California has adopted its own apprenticeship standards, 8 Cal. Code Regs. §212 (1996), that are "substantively similar" to the federal standards.   *Southern Cal. Chapter of Associated Builders and Contractors, Inc., Joint Apprenticeship Committee* v. *California Apprenticeship Council*, 4 Cal. 4th 422, 434, 841 P. 2d

---

[1] The Fitzgerald Act provides: "The Secretary of Labor is authorized and directed to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices, to extend the application of such standards by encouraging the inclusion thereof in contracts of apprenticeship, to bring together employers and labor for the formulation of programs of apprenticeship, [and] to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship . . . ."   29 U. S. C. §50.

1011, 1017 (1992) *(Southern Cal. ABC)*. The CAC uses its own standards whether approving an apprenticeship program for federal or for state purposes.

An apprenticeship program in California may be sponsored by an individual employer, an individual labor union, a group of employers, a group of labor organizations, or by a joint management-labor venture (a so-called joint apprenticeship committee). See Cal. Lab. Code Ann. § 3075 (West 1989).

B

In the spring of 1987, respondent Dillingham Construction was awarded a public works contract as the general contractor for the construction of the Sonoma County Main Adult Detention Facility. Dillingham subcontracted electronic installation work to respondent Manuel J. Arceo, doing business as Sound Systems Media.

When Sound Systems Media was awarded the subcontract, it was signatory to a collective-bargaining agreement that provided a wage scale for apprentices, and required Sound Systems Media to contribute to a CAC-approved apprenticeship program, the Northern California Sound and Communications Joint Apprenticeship Training Committee.

In May 1988, after work on the project was underway, the existing union withdrew its representation of Sound Systems Media employees. Two months later, Sound Systems Media entered a new collective-bargaining agreement with a different union. That agreement, like the earlier one, included a scale of wages for apprentices and provided for an affiliation with a joint apprenticeship committee, the Electronic and Communications Systems Joint Apprenticeship Training Committee (Electronic and Communications Systems JATC). Sound Systems Media relied on this new committee for its apprentices, to whom it paid the apprentice wage provided in the collective-bargaining agreement. The Electronic and Communications Systems JATC, however, did not seek CAC

approval until August 1989 and did not gain approval until October 1990. That approval was not retroactive.

In March 1989, yet another union filed a complaint against Sound Systems Media with petitioner Division of Apprenticeship Standards of the California Department of Industrial Relations. Petitioner issued a notice of noncompliance to both Dillingham Construction and Sound Systems Media, charging that Sound Systems Media had violated Cal. Lab. Code Ann. § 1771 (West 1989) by paying the apprentice wage, rather than the prevailing journeyman wage, to apprentices from a nonapproved program. The County of Sonoma was ordered to withhold certain moneys from Dillingham Construction for the violation.

Respondents filed suit to prevent petitioners from interfering with payment under the subcontract. Their complaint alleged, *inter alia,* that ERISA pre-empted enforcement of the prevailing wage law. Respondents argued that the Electronic and Communications Systems JATC was an "employee welfare benefit plan" within the meaning of ERISA § 3(1), 29 U. S. C. § 1002(1),[2] and that California's prevailing wage statute "relate[d] to" it, and was therefore superseded by ERISA's pre-emption provision, § 514(a), 29 U. S. C. § 1144(a).[3] The District Court agreed that the prevailing wage statute "relate[d] to" ERISA plans, but con-

---

[2] Section 3(1) defines an "employee welfare benefit plan" as: "[A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants . . . (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, *apprenticeship or other training programs,* or day care centers, scholarship funds or prepaid legal services . . . ." 29 U. S. C. § 1002(1) (emphasis added).

[3] The pre-emption clause provides that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title." § 1144(a).

cluded that pre-emption was forestalled by ERISA's saving clause, § 514(d), 29 U. S. C. § 1144(d).[4] Pre-emption of the prevailing wage statute, the District Court determined, would "impair the purposes of the Fitzgerald Act and its regulations within the meaning of ERISA's savings clause." *Dillingham Constr. N. A., Inc.* v. *County of Sonoma,* 778 F. Supp. 1522, 1530 (ND Cal. 1991).

The Court of Appeals for the Ninth Circuit reversed. 57 F. 3d 712 (1995). Agreeing with the District Court, the Ninth Circuit held that the Electronic and Communications Systems JATC was an employee welfare benefit plan and that § 1777.5 "relate[d] to" it. *Id.,* at 718–719. Because California's prevailing wage statute was not an "enforcement mechanism" of the Fitzgerald Act, however, the Ninth Circuit parted company with the District Court and held that § 1777.5 was not preserved by ERISA's saving clause. *Id.,* at 721. The decision of the Court of Appeals accorded with that of the Court of Appeals for the Tenth Circuit in *National Elevator Industry, Inc.* v. *Calhoon,* 957 F. 2d 1555, cert. denied, 506 U. S. 953 (1992). Both decisions conflict— as to whether a state prevailing wage law "relate[s] to" apprenticeship programs, and as to the reach of the saving clause—with that of the Eighth Circuit in *Minnesota Chapter of Associated Builders and Contractors, Inc.* v. *Minnesota Dept. of Labor and Industry,* 47 F. 3d 975 (1995). We granted certiorari, 517 U. S. 1133 (1996), and now reverse.

## II

Both lower courts determined, and neither party disputes, that the Electronic and Communications Systems JATC was a "plan, fund, or program [that] was established or is maintained for the purpose of providing for its participants . . .

---

[4] ERISA's saving clause provides that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any laws of the United States . . . or any rule or regulation issued under any such law." § 1144(d).

apprenticeship or other training programs." § 3(1), 29 U. S. C. § 1002(1). The question thus presented to us is whether California's prevailing wage statute "relate[s] to" that "employee welfare benefit plan" within the meaning of ERISA's pre-emption clause.

Since shortly after its enactment, we have endeavored with some regularity to interpret and apply the "unhelpful text" of ERISA's pre-emption provision. *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 656 (1995). We have long acknowledged that ERISA's pre-emption provision is "clearly expansive." *Id.*, at 655. It has

> "a 'broad scope,' *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 739 (1985), and an 'expansive sweep,' *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41, 47 (1987); and . . . it is 'broadly worded,' *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 138 (1990), 'deliberately expansive,' *Pilot Life, supra*, at 46, and 'conspicuous for its breadth,' [*FMC Corp.* v. *Holliday*, 498 U. S. 52, 58 (1990)]." *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384 (1992).

Our efforts at applying the provision have yielded a two-part inquiry: A "law 'relate[s] to' a covered employee benefit plan for purposes of § 514(a) 'if it [1] has a connection with or [2] reference to such a plan.'" *District of Columbia* v. *Greater Washington Bd. of Trade*, 506 U. S. 125, 129 (1992) (quoting *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 96–97 (1983)). Under the latter inquiry, we have held pre-empted a law that "impos[ed] requirements by reference to [ERISA] covered programs," *Greater Washington Bd. of Trade, supra*, at 130–131; a law that specifically exempted ERISA plans from an otherwise generally applicable garnishment provision, *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 828, n. 2, 829–830 (1988); and a common-law cause of action premised on the existence of an ERISA plan,

*Ingersoll-Rand Co.* v. *McClendon,* 498 U. S. 133, 140 (1990). Where a State's law acts immediately and exclusively upon ERISA plans, as in *Mackey,* or where the existence of ERISA plans is essential to the law's operation, as in *Greater Washington Bd. of Trade* and *Ingersoll-Rand,* that "reference" will result in pre-emption.

A law that does not refer to ERISA plans may yet be pre-empted if it has a "connection with" ERISA plans. Two Terms ago, we recognized that an "uncritical literalism" in applying this standard offered scant utility in determining Congress' intent as to the extent of § 514(a)'s reach. *Travelers,* 514 U. S., at 656. Rather, to determine whether a state law has the forbidden connection, we look both to "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," *ibid.,* as well as to the nature of the effect of the state law on ERISA plans, *id.,* at 658–659.

As is always the case in our pre-emption jurisprudence, where "federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.,* at 655 (quoting *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947)) (citation omitted).

A

Respondents and several of their *amici* urge us to conclude that § 1777.5 makes "reference to" ERISA plans. Because it seems that approved apprenticeship programs need not necessarily be ERISA plans, we decline to do so.

On its face, § 1777.5 appears to allow the lower apprentice wage only to a contractor who acquires apprentices through a "joint apprenticeship committee"—an apprenticeship program sponsored by the collective efforts of management and organized labor. See Cal. Lab. Code Ann. §§ 3075, 3076 (West 1989). Were this the true extent of the prevailing

wage law's reach, respondents' "reference to" argument might be more persuasive. The CAC has, however, promulgated regulations making clear that the class of apprenticeship program sponsors who may provide approved apprentices is broader. See 8 Cal. Code Regs. § 230.1(a) (1992) ("Registered apprentices can only be obtained from the *Apprenticeship Committee* of the craft or trade in the area of the site of the public work" (emphasis added)); *id.*, § 228(c) (defining an apprenticeship committee as "an apprenticeship program sponsor"); Cal. Lab. Code Ann. § 3075 (West 1989) (stating that an "apprenticeship program sponsor may be a joint apprenticeship committee, unilateral management or labor apprenticeship committee, or an individual employer"). An apprenticeship program, it would seem, can be maintained by a single employer, and its costs can be defrayed out of that employer's general assets.

To comport with § 302(c)(6) of the Labor Management Relations Act, 1947, 61 Stat. 157, as amended, 29 U. S. C. § 186(c)(6), the expenses of any *joint* apprenticeship committee must be defrayed out of moneys placed into a separate fund. The existence of that fund triggers ERISA coverage over programs like that of the Electronic and Communications Systems JATC. See ERISA Advisory Op. No. 94–14A (Apr. 20, 1994). But an employee benefit program *not* funded through a separate fund is not an ERISA plan. In *Massachusetts* v. *Morash*, 490 U. S. 107 (1989), we recognized a distinction between vacation benefits paid out of an accumulated fund and those paid out of an employer's general assets. A fund established to pay vacation benefits, we held, constituted an employee welfare benefit plan; the policy at issue in *Morash*, whereby vacation benefits were paid out of general assets, did not. The distinction, we concluded, was compelled by ERISA's object and policy:

> "In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employ-

ees benefits from accumulated funds. To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator." *Id.,* at 115 (citation and footnote omitted).

Benefits paid out of an employer's general assets presented risks indistinguishable from "the danger of defeated expectations of wages for services performed," a hazard with which ERISA is unconcerned. *Ibid.*

The Secretary has carried this funded/unfunded distinction into areas that are, we think, analogous to that of apprenticeship programs. See, *e. g.,* 29 CFR §2510.3–1(k) (1994) (scholarship programs paid for out of an employer's general assets are not ERISA plans); §2510.3–1(b)(3)(iv) (training provided on the job with general assets does not constitute ERISA plan); see also ERISA Advisory Op. No. 94–14A (Apr. 20, 1994) (apprenticeship programs paid for out of trust funds are ERISA plans); ERISA Advisory Op. No. 83–32A (June 21, 1983) (in-house professional development program financed out of general assets is not an ERISA plan). Although none of these regulations specifically answers the question whether an unfunded apprenticeship program is covered by ERISA, they suggest—as does our decision in *Morash*—that it is not.[5]

---

. [5] We are told that "[m]ost state-approved apprenticeship programs in the construction industry in California appear to be ERISA plans." Brief for United States as *Amicus Curiae* 17, n. 8. Between April and June 1994, California had 175 joint apprenticeship programs and 13 "unilateral" ones. *Ibid.* As noted above, the costs of the joint apprenticeship programs are necessarily defrayed out of separate funds. The Government points out that some of the 13 unilateral programs may also have separate funds. *Ibid.* No party before us has established that *all* programs do. Cf. *The Travelers Ins. Co.* v. *Cuomo,* 14 F. 3d 708, 711 (CA2 1994) (noting that 88% of "non-elderly Americans have private health care insurance through [ERISA] plans"), rev'd by *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.,* 514 U. S. 645 (1995).

Section 1777.5, then, "functions irrespective of . . . the existence of an ERISA plan." *Ingersoll-Rand Co.*, 498 U. S., at 139. An apprenticeship program meeting the substantive standards set forth in the Fitzgerald Act regulations can be approved whether or not its funding apparatus is of a kind as to bring it under ERISA. See *Southern Cal. ABC*, 4 Cal. 4th, at 429, n. 1, 841 P. 2d, at 1014, n. 1. Section 1777.5 is indifferent to the funding, and attendant ERISA coverage, of apprenticeship programs. Accordingly, California's prevailing wage statute does not make reference to ERISA plans. We turn now to the question whether it nonetheless has a "connection with" such plans.

## B

In *Shaw* v. *Delta Air Lines, Inc.*, we held that the New York Human Rights Law, which prohibited "employers from structuring their employee benefit plans in a manner that discriminates on the basis of pregnancy," and New York's Disability Benefits Law, which required "employers to pay employees specific benefits," "relate[d] to" ERISA plans. 463 U. S., at 97. *Shaw* and other of our ERISA pre-emption decisions, see, *e. g., FMC Corp.* v. *Holliday*, 498 U. S. 52 (1990); *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504 (1981), presented us with state statutes that "mandated employee benefit structures or their administration"; in those cases, we concluded that these requirements amounted to "connection[s] with" ERISA plans. See *Travelers*, 514 U. S., at 658.

The state law at issue in *Travelers*, our most recent exercise in ERISA pre-emption, stands in considerable contrast. That statute regulated hospital rates, and required hospitals to exact surcharges (ranging from 9% to 24% of the rate set under the statute) from patients whose hospital bills were paid by any of a variety of non-Blue Cross/Blue Shield providers. Because ERISA plans, as might be expected, were predominant among the purchasers of insurance, see Brief

for Petitioner in *Travelers*, O. T. 1994, No. 93–1408, p. 1–2, the statute was asserted to run afoul of ERISA's pre-emption provision. The differential rates charged to commercially insured patients and to patients insured by Blue Cross/Blue Shield (collectively "the Blues") made commercial insurance relatively more expensive—and relatively less attractive. The resulting cost variations encouraged insurance purchasers, including ERISA plans, to provide insurance benefits through the Blues. Commercial insurers argued that these cost variations and their resulting economic effects had a "connection with" those ERISA plans, requiring pre-emption of the law that dictated them.

We upheld the statute. The "indirect economic influence" of the surcharge, we noted, did not "bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself." 514 U. S., at 659. Nor did the indirect influence of the surcharge "preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishe[d] to provide one." *Id.*, at 660. Indeed, if ERISA were concerned with any state action—such as medical-care quality standards or hospital workplace regulations—that increased costs of providing certain benefits, and thereby potentially affected the choices made by ERISA plans, we could scarcely see the end of ERISA's pre-emptive reach, and the words "relate to" would limit nothing. *Id.*, at 660–661. We also noted that several States regulated hospital charges at the time that ERISA was enacted, and yet neither ERISA's language nor legislative history made any mention of pre-empting these state efforts.[6]

---

[6] In fact, the very same Congress that enacted ERISA adopted, a short time later, the National Health Planning and Resources Development Act of 1974 (NHPRDA), Pub. L. 93–641, 88 Stat. 2225, §§ 1–3, repealed by Pub. L. 99–660, title VII, § 701(a), 100 Stat. 3799, which "sought to encourage and help fund state responses to growing health care costs and the widely diverging availability of health services." *Travelers, supra,* at 665. The NHPRDA had in mind a system akin to New York's, and we thought it

We think that, in every relevant respect, California's prevailing wage statute is indistinguishable from New York's surcharge program. At the outset, we note that apprenticeship standards and the wages paid on state public works have long been regulated by the States. As discussed in Part I-A, *supra*, California has required that prevailing wages be paid on its public works projects for nearly as long as Congress has required them to be paid on federal projects, and for more than 40 years prior to the enactment of ERISA. Similarly, California has legislated in the apprenticeship area for the better part of this century. See, *e. g.*, The Shelley-Maloney Apprentice Labor Standards Act, 1939 Cal. Stat. 220, codified at Cal. Lab. Code § 3070 *et seq.* Congress, in the Fitzgerald Act, recognized pre-existing state efforts in regulating apprenticeship programs and apparently expected that those efforts would continue. See 29 U. S. C. § 50 (directing the Secretary of Labor "to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship"); see also H. R. Rep. No. 945, 75th Cong., 1st Sess., 2 (1937).

That the States traditionally regulated these areas would not alone immunize their efforts; ERISA certainly contemplated the pre-emption of substantial areas of traditional state regulation. The wages to be paid on public works projects and the substantive standards to be applied to apprenticeship training programs are, however, quite remote from the areas with which ERISA is expressly concerned— "'reporting, disclosure, fiduciary responsibility, and the like.'" *Travelers, supra,* at 661 (quoting *Shaw,* 463 U. S., at 98). A reading of § 514(a) resulting in the pre-emption of traditionally state-regulated substantive law in those areas where ERISA has nothing to say would be "unsettling," *Travelers,*

_____

unlikely that the Congress that enacted ERISA would later have sought to encourage a state program that ERISA would pre-empt.

514 U. S., at 665.[7]  Given the paucity of indication in ERISA and its legislative history of any intent on the part of Congress to pre-empt state apprenticeship training standards, or state prevailing wage laws that incorporate them, we are reluctant to alter our ordinary "assumption that the historic police powers of the States were not to be superseded by the Federal Act." *Rice,* 331 U. S., at 230.[8]  Accordingly, as in

---

[7] In *Travelers,* we were convinced that Congress did not intend pre-emption of New York's law both by the lack of any positive indication that Congress harbored such an intent, and by indirect evidence—the NHPRDA—that the Congress that enacted ERISA did not intend to supersede state laws like New York's regulation of hospital charges.  514 U. S., at 664–668.  We face here a similar absence of positive indications on the part of Congress that apprenticeship or prevailing wage statutes would be superseded.  The United States further argues that the Fitzgerald Act is analogous to the NHPRDA: Were we to hold § 1777.5 pre-empted "[t]hat result 'would leave States without the authority to do just what Congress was expressly trying to induce them to do by enacting the Fitzgerald Act.'"  Brief for United States as *Amicus Curiae* 22 (internal quotation marks and brackets omitted).  In *Travelers,* we thought it implausible that the Congress that enacted ERISA intended to pre-empt state laws that the same Congress subsequently sought to encourage with the NHPRDA.  It is not, however, inconceivable for the ERISA Congress to intend the pre-emption of state statutes resulting from the pre-existing Fitzgerald Act.  So, the United States' analogy is not decisive.  It does, however, aid our conclusion that Congress' silence on the pre-emption of state statutes that Congress previously sought to foster counsels against pre-emption here.

[8] Respondents and two of their *amici* point to bills introduced in Congress for the purpose, at least in part, of overruling lower court decisions holding prevailing wage statutes like California's pre-empted.  See Brief for Respondent 23, Brief for Signatory Members of the Coalition to Preserve ERISA Pre-emption as *Amicus Curiae* 11, and Brief for Associated Builders and Contractors, Inc., et al. as *Amici Curiae* 26–27 (all citing H. R. 1036, 103d Cong., 1st Sess. (1993); S. 1580, 103d Cong., 1st Sess. (1993)).  It is argued that Congress' unwillingness to amend § 514(a) in response to these decisions is evidence that Congress believed that those opinions accurately interpreted ERISA's pre-emptive scope.  We have rejected similar arguments before.  See *Firestone Tire & Rubber Co.* v.

*Travelers,* we address the substance of the California statute with the presumption that ERISA did not intend to supplant it.

Like New York's surcharge requirement, the apprenticeship portion of the prevailing wage statute does not bind ERISA plans to anything. No apprenticeship program is required by California law to meet California's standards. See *Southern Cal. ABC,* 4 Cal. 4th, at 428, 841 P. 2d, at 1013. If a contractor chooses to hire apprentices for a public works project, it need not hire them from an approved program (although if it does not, it must pay these apprentices journeyman wages). So, apprenticeship programs that have not gained CAC approval may still supply public works contractors with apprentices. Unapproved apprenticeship programs also may supply apprentices to private contractors.[9] The effect of § 1777.5 on ERISA apprenticeship programs, therefore, is merely to provide some measure of economic incentive to comport with the State's requirements, at least to the extent that those programs seek to provide apprentices who can work on public works projects at a lower wage.

Apprenticeship programs have confronted these differential economic incentives since well before the enactment of ERISA, and would face them today even if California had no prevailing wage statute. To supply apprentices eligible for the apprenticeship wage to *federal* public works contractors, an apprenticeship program must meet the standards promulgated by California under the Fitzgerald Act.[10] What is

---

*Bruch,* 489 U. S. 101, 114 (1989); *United States* v. *Price,* 361 U. S. 304, 313 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one").

[9] In New York, we are told, "approximately half of all construction is not subject to state or federal prevailing wage requirements." Brief for State of Washington et al. as *Amici Curiae* 21, n. 14 (citing F. W. Dodge Division, McGraw-Hill Information Systems, Inc. (1996)).

[10] It may also be that, because California's standards are "substantively similar," *Southern California ABC,* 4 Cal. 4th, at 434, 841 P. 2d, at 1017, to the federal standards, multistate apprenticeship programs are not

more, with or without the possibility of being able to provide apprentices eligible for a lower wage on public projects, apprenticeship programs in California have other incentives to seek CAC approval. See *Southern Cal. ABC, supra*, at 429, 841 P. 2d, at 1013 ("In California, additional financial incentives exist in the form of direct financial subsidies for training provided by approved programs," and because "an apprentice who completes an approved training program obtains a certificate of completion naming him or her a skilled journeyman in the chosen trade"). It cannot be gainsaid that § 1777.5 has the effect of encouraging apprenticeship programs—including ERISA plans—to meet the standards set out by California, but it has not been demonstrated here that the added inducement created by the wage break available on state public works projects is tantamount to a compulsion upon apprenticeship programs.[11]

---

saddled with "the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 142 (1990). Then again, the area of apprenticeship training may be one where uniformity of substantive standards across States is impossible. See Brief for United States as *Amicus Curiae* 20 ("[P]revailing wages in different States—or even in different areas of a single State—may vary substantially, and training requirements for membership in skilled trades may also vary among different trades, different communities, and different States"). We need not resolve this question. Suffice it to say that the federal and state apprenticeship standards are not mandatory, and California's standards do not result in disuniformities different in kind from those that would exist without them.

[11] It is not conclusive as to California's apprenticeship programs, but we note that some data support the conclusion that the prevailing wage break for approved apprenticeship programs does not present ERISA plans with a Hobson's choice. *Amici* State of Washington et al. inform us that "[w]hile the federal government and twenty-seven of the thirty-one states which have prevailing wage laws have [a wage break], it is estimated that only fifty percent of apprentices in this country are in state or federally 'approved' programs." Brief for State of Washington et al. as *Amici Curiae* 20, and n. 13.

The effect of the prevailing wage statute on ERISA-covered apprenticeship programs in California is substantially similar to the effect of New York law on ERISA plans choosing whether to provide health insurance benefits in New York through the Blues, or through a commercial carrier. The prevailing wage statute alters the incentives, but does not dictate the choices, facing ERISA plans. In this regard, it is "no different from myriad state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate." *Travelers*, 514 U. S., at 668. We could not hold pre-empted a state law in an area of traditional state regulation based on so tenuous a relation without doing grave violence to our presumption that Congress intended nothing of the sort. We thus conclude that California's prevailing wage laws and apprenticeship standards do not have a "connection with," and therefore do not "relate to," ERISA plans.[12]

### III

For the reasons stated herein, the judgment below is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE GINSBURG joins, concurring.

Since ERISA was enacted in 1974, this Court has accepted certiorari in, and decided, no less than 14 cases to resolve conflicts in the Courts of Appeals regarding ERISA preemption of various sorts of state law.[1] The rate of accept-

---

[12] Because we determine that § 1777.5 does not "relate to" ERISA plans, we need not determine whether ERISA's saving clause, § 514(d), 29 U. S. C. § 1144(d), nonetheless forestalls pre-emption.

[1] In addition to the case at bar, the Court has addressed the application of ERISA's pre-emption provision in the following cases: *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.,* 514 U. S. 645 (1995); *John Hancock Mut. Life Ins. Co.* v. *Harris Trust and Sav.*

ance, moreover, has not diminished (we have taken two more ERISA pre-emption cases so far this Term),[2] suggesting that our prior decisions have not succeeded in bringing clarity to the law.

I join the Court's opinion today because it is a fair description of our prior case law, and a fair application of the more recent of that case law. Today's opinion is no more likely than our earlier ones, however, to bring clarity to this field—precisely because it does obeisance to all our prior cases, instead of acknowledging that the criteria set forth in some of them have in effect been abandoned. Our earlier cases sought to apply faithfully the statutory prescription that state laws are pre-empted "insofar as they . . . relate to any employee benefit plan." Hence the many statements, repeated today, to the effect that the ERISA pre-emption provision has a "broad scope," an "expansive sweep," is "broadly worded," "deliberately expansive," and "conspicuous for its breadth." *Ante*, at 324. But applying the "relate to" provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else. Accord, *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655 (1995). The statutory text provides an illusory test, unless the Court is willing to decree a

---

*Bank*, 510 U. S. 86 (1993); *District of Columbia* v. *Greater Washington Bd. of Trade*, 506 U. S. 125 (1992); *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133 (1990); *FMC Corp.* v. *Holliday*, 498 U. S. 52 (1990); *Massachusetts* v. *Morash*, 490 U. S. 107 (1989); *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825 (1988); *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1 (1987); *Metropolitan Life Ins. Co.* v. *Taylor*, 481 U. S. 58 (1987); *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U. S. 41 (1987); *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724 (1985); *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85 (1983); and *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504 (1981).

[2] See *Boggs* v. *Boggs*, cert. granted, *post*, p. 957; *De Buono* v. *NYSA–ILA Medical and Clinical Services Fund*, cert. granted, *post*, p. 926.

degree of pre-emption that no sensible person could have intended—which it is not.

I think it would greatly assist our function of clarifying the law if we simply acknowledged that our first take on this statute was wrong; that the "relate to" clause of the pre-emption provision is meant, not to set forth a *test* for pre-emption, but rather to identify the field in which ordinary *field pre-emption* applies—namely, the field of laws regulating "employee benefit plan[s] described in section 1003(a) of this title and not exempt under section 1003(b) of this title," 29 U. S. C. § 1144(a). Our new approach to ERISA pre-emption is set forth in *John Hancock Mut. Life Ins. Co.* v. *Harris Trust and Sav. Bank*, 510 U. S. 86, 99 (1993): "[W]e discern no solid basis for believing that Congress, when it designed ERISA, intended fundamentally to alter traditional pre-emption analysis." I think it accurately describes our current ERISA jurisprudence to say that we apply ordinary field pre-emption, and, of course, ordinary conflict pre-emption. See generally *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 248 (1984) (explaining general principles of field and conflict pre-emption); *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947) (field pre-emption); *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963) (conflict pre-emption). Nothing more mysterious than that; and except as establishing that, "relates to" is irrelevant.