LILLEHAUG, Justice
(dissenting).
The chief question presented in this case is whether the definition of “wages” in the Minnesota unemployment insurance statute is preempted by ERISA. I disagree with the majority that the Minnesota definition has a “connection with” ERISA plans and is thereby preempted.
The majority finds such a connection based on its concern that the definition of “wages” under Minnesota law will “bind” or “require” plan administrators to make certain choices for their Minnesota employees. The definition does no such thing, and the majority’s reasoning fundamentally misstates the nature of the preemption inquiry. The goal of ERISA preemption, as it is relevant to this case, is to allow plan administrators to provide a uniform benefit without regard to differences in state law, if they wish to do so. But the entire point of a supplemental unemployment benefit (SUB) plan is to provide a benefit that vanes based on differences in state law. If plan administrators wish to provide a severance benefit that is uniform across state lines, they can easily do so. But if they wish to provide a benefit — like the benefit provided by a SUB plan — that adapts to the unemployment insurance law of Minnesota and the differing laws of other states, they must take state law as they find it. The alternative, embraced by the majority here, allows the existence of a corporation’s SUB plan to dictate the con *309 ditions under which our state government must pay unemployment benefits to terminated employees. Because nothing in ERISA requires such a result, I respectfully dissent.
I.
Minnesota Statutes Chapter 268, Minnesota’s unemployment insurance statute, contains a detailed definition of “wages.” See Minn.Stat. § 268.035, subd. 29 (2014).[1] “Wages” means “all compensation for employment.” Id., subd. 29(a). Relevant here is that “compensation” includes “severance payments.” Id. Commonly understood, severance pay is “[m]oney (apart from back wages or salary) that an employer pays to a dismissed employee. The payment may be made in exchange for a release of any claims that the employee might have against the employer.” Severance Pay, Black’s Law Dictionary (10th ed.2014).
In Minnesota’s program, a worker is not eligible to receive unemployment benefits for any week in which the worker receives “severance pay, bonus pay, or any other payments paid by an employer because of, upon, or after separation from employment.” Minn.Stat. § 268.085, subd. 3(a)(2) (2012). But under an exception to this rule, a worker may receive unemployment benefits if the severance payment is not considered “wages” under section 268.035, subd. 29. Minn.Stat. § 268.085, subd. 3(a)(2). There are 17 exceptions to the definition of “wages” in subdivision 29(a). One such exception, which was added by the Legislature in 2007, deals with SUB plan payments. That exception, as amended in 2011, 2012, and 2014, and now numbered (13), excludes from the definition of “wages” the following: “payments made to supplement unemployment benefits under a plan established by an employer.”
The exception for SUB plan payments contains six limitations. First, the payments must be “solely for the supplementing of weekly state or federal unemployment benefits.” Minn.Stat. § 268.035, subd. 29(a)(13). Second, the payments must be only for weeks when the employee has been paid unemployment benefits. Third, the payments, together .with benefits from the state, must not exceed the employee’s regular weekly pay. Fourth, the payments may not be assigned or increased. Fifth, the payments cannot be for 'Consideration other than a release of claims. Sixth, the plan must not be designed to avoid Social Security or unemployment taxes. Id.
To sum up the statutory scheme: payments, however denominated, from an employer to a terminated employee are “severance payments” and thus “wages” for purposes of state unemployment insurance tax assessment and benefits, unless the payments fit within the exception, with limitations, in subdivision 29(a)(13). While I have not located any illuminating legislative history on subdivision 29(a)(13), it makes sense that Minnesota has chosen to include “severance payments” within its broad definition of “wages,” carving out only a limited exception for payments from certain SUB plans that are truly supplemental.
Therefore, Minnesota’s unemployment insurance program, like that of many other states, provides a series of choices for both the employer and the terminated employ *310 ee. The employer has the choice to terminate the employee. The employer has the choice to offer severance benefits to the employee. The employer has the choice to offer severance benefits that fit, or do not fit, with the state’s unemployment insurance program. The employee has the choice to apply for and receive state unemployment benefits. And the employee has the choice to accept the employer’s offer of severance benefits (in exchange for a release), understanding that acceptance of the severance benefits may affect the employee’s eligibility for state benefits.
II.
With this background, I turn now to the problem posed by this case, which is created by the General Dynamics Employee Transition Benefit Plan (the Plan). The Plan was offered by an employer, General Dynamics, which did not appear at the unemployment law judge (ULJ) and court of appeals hearings, and did not file a brief or appear before us. The parties that did appear, the employee and the State, did not put the Plan into the record.[2]
We have in the record only a “Frequently Asked Questions” brochure that purports to describe some of the Plan’s terms. The brochure emphasizes that the first step for the employee is to “sign a copy of the [severance] agreement and release that you received from the [sic] General Dynamics and return it to your Human Resources Representative.” This makes clear that the SUB payments are consideration given in exchange for the release.
The next step, advises the brochure, is to “apply for unemployment compensation.” According to the brochure, the premise of the Plan is that the employee will receive state unemployment benefits and then receive SUB payments, which will consist of the employee’s weekly wage minus the state benefits received.
Despite the obvious fact that the SUB payments under the Plan are severance payments (and thus wages) under Minnesota law, the brochure instructs the employee: “Do not declare these amounts as severance benefits when applying for state unemployment benefits. These payments are supplemental unemployment compensation benefits awarded through the General Dynamics Corporation Employment Transition Benefit Plan qualified under the provisions of the Employee Retirement Income Security Act of 1974 as amended. Reporting these amounts as severance payments could jeopardize your claim for ETB [Plan] payments.”
The employee seems to have done as instructed by General Dynamics. He applied for and was deemed eligible for state benefits. But the Plan made a SUB payment during the first week when the employee was not yet eligible to receive state benefits. When the State learned that the employee was receiving payments that would constitute severance payments and thus “wages” under Minnesota law, the State sought and received an order from the ULJ recouping a portion of the state benefits. The record is silent on whether the Plan has reimbursed the employee for the amount recouped by the State or whether the Plan has recouped from the employee the SUB payments he received from the Plan.
III.
The employee (with the employer and the Plan perhaps just off stage) now *311 makes a novel legal argument:. that ERISA somehow preempts the definition of “wages” in the state unemployment insurance program, thus allowing the employee to keep all state benefits and all Plan benefits.
Whether ERISA preempts a state law is a question of congressional intent. Ingersoll-Rand Co. v. McClendon, 498 U.S. 138, 137-38, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). A state law is preempted if it “relate[s] to any employee benefit plan” described and not exempt. 29 U.S.C. § 1144(a) (2012). As the majority indicates, the chief question here is whether the state law “has a connection with ... such a plan.” N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).[3]
In deciding whether state law is preempted, we start with the presumption that Congress did not intend to supplant state law. Travelers, 514 U.S. at 654, 115 S.Ct. 1671. Particularly when it concerns a field of traditional state regulation, we assume that Congress did not intend to supersede a state’s historic police powers unless Congress’ purpose is “clear and manifest.” Calif. Div. of Labor Standards Enforcement v. Dillingham, 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). Although the Supreme Court has stated that a state law may “relate to” ERISA plans “even if the law is not specifically designed to affect such plans, or the effect is only indirect,” Ingersoll-Rand, 498 U.S. at 139, 111 S.Ct. 478, the Court has also cautioned against an “uncritical literalism” that would make preemption turn on “infinite connections.” Travelers, 514 U.S. at 656, 115 S.Ct. 1671. Specifically, the Court has made clear that state laws that have only “[a]n indirect economic influence” on ERISA-governed plans and which “do[] not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself,” nor “preclude uniform administrative practice or the provision of a uniform interstate benefit package if a plan wishes to provide one,” are not preempted. Travelers, 514 U.S. at 659-60, 115 S.Ct. 1671. In particular, state laws that “alter[ ] the incentives, but do[] not dictate the choices, facing ERISA plans,” are not preempted. Dillingham, 519 U.S. at 334, 117 S.Ct. 832.
In my view, it is clear that the definition of “wages” in Minn.Stat. § 268.035, subd. 29(a) falls comfortably within the category of state laws that aré not subject to preemption. Indeed, the employee, the court of appeals majority, and the majority here have not pointed to any congressional desire to preempt state unemployment insurance provisions. There is nothing in ERISA, legislative history, case law, or the record to show that Congress intended to have ERISA preempt a definition that affects how the State assesses taxes for, and pays benefits from, its own unemployment insurance program. There is not even a hint in ERISA that a state cannot *312 define “wages” however it sees fit for purposes of its unemployment insurance program. The definition of “wages” is a critical part of the state’s taxing, spending, police, and welfare powers, so there must be a “clear and manifest”' intent to preempt it. See Dillingham, 519 U.S. at 325, 117 S.Ct. 832. There is none. “This is not a case in which [Minnesota] has forbidden a method of calculating ... benefits that federal law permits, or required employers to provide certain benefits. Nor is it a case in which the existence of a [benefit] plan is a critical element of a state-law cause of action, or one in which the state statute contains provisions that expressly refer to ERISA or ERISA plans.” De Buono v. NYSA-ILA Med. & Clinical Servs. Fund, 520 U.S. 806, 814-15, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997) (footnotes omitted).
Nevertheless, the majority finds a congressional intent to preempt Minnesota’s definition of “wages” based on the definition’s indirect effects on benefits paid out under SUB plans; By the majority’s account, the practical effect of Minnesota’s definition of “wages” is make plan administrators “modify SUB plans for Minnesota participants,” thereby “requiring] plan administrators to make certain choices.” Similarly, the court of appeals majority asserted that, without preemption, plan administrators would be “coerced” to modify their plans.
The majority’s conclusion is incorrect as a factual matter. The definition of “wages” in the Minnesota unemployment insurance program does not bind any administrator. When General Dynamics and other corporations choose to terminate .employees, they can choose to offer, or not offer, a severance package that includes SUB pay. They can offer a uniform severance benefit package not tailored to state unemployment benefits eligibility, or they can offer a package that is truly “supplemental” to state benefits which, of necessity, vary from state to state. Indeed, the entire purpose of “supplemental” benefits is that they take those variations among states into account in some way. Although Minnesota law (or the law of other states) might prompt plan administrators to make certain choices in order to accomplish their desired goal (allowing a terminated employee to continue receiving a weekly severance payment equal to her normal salary), nothing about Minnesota’s definition of wages “binds” or “requires” plan administrators to do anything whatsoever. Indeed Minnesota’s definition does not impose any requirements, obligations, or limitations on severance plans or on their administrators. And at oral argument, both parties agreed that there is not a bit of evidence in the record that, since the Minnesota definition was enacted into statute in 2007, plan administrators have been required by Minnesota to modify their SUB plans.[4] In other words, Minnesota’s definition “alters the incentives, but does not dictate the choices” for plan administrators. See Dillingham, 519 U.S. at 334, 117 S.Ct. 832.
Thus, the situation in this case is entirely unlike that in Egelhoff v. Egelhoff, 532 U.S. 141, 121 S.Ct. 1322, 149 L.Ed.2d 264 *313 (2001), from which the majority draws support. In Egelhoff, the Supreme Court of the United States considered a Washington statute providing for automatic revocation, upon divorce, of any designation of a spouse as beneficiary of a nonprobate asset. The court held that the statute was preempted by ERISA, because it “binds ERISA plan administrators to a particular choice of rules for determining beneficiary status,” in that it requires administrators to “pay benefits to the beneficiaries chosen by state law, rather than to those identified in the plan documents,” an “area of core ERISA concern.” Id. at 147, 121 S.Ct. 1322. Noting that ERISA requires that ERISA plans make payments as set out in their plan documents, the Court in Egelhoff specifically distinguished between the situation it faced and “generally applicable laws regulating ‘areas where ERISA has nothing to say,’ which we have upheld notwithstanding their incidental effect on ERISA plans.” Id. at 147-48, 121 S.Ct. 1322 (citation omitted). In this case, the majority picks up on the language that payment of benefits to a specific beneficiary is an “area of core ERISA concern.” But the Minnesota statute at issue in this case does not require the Plan to make payments to any particular beneficiary; indeed, it does not directly affect SUB plans, their administrators, or the payments they make in any way. Instead, the Minnesota statute is a generally applicable law with only an “incidental effect” on ERISA plans, which Egelhoff noted is typically not preempted.
But, the majority argues, the effect of the definition of wages under Minnesota law is to “undermine the purpose of a SUB plan to supplement state unemployment benefits.” This puts the cart before the horse. By its very name, SUB pay is “supplemental”; in other words, it is designed to provide a benefit that supplements and depends on state benefits. ERISA preemption protects the right of a plan to provide “a uniform interstate benefit package if a plan wishes to provide one,” Travelers, 514 U.S. at 660, 115 S.Ct. 1671 (emphasis added), but it does not address the situation when a plan intentionally chooses to pay benefits that vary according to state law. Generally, SUB pay “must be linked to the receipt of state unemployment compensation,” Rev. Rul. 90-72, 1990-2 C.B. 211. Unemployment compensation may be generous in some states and meager in others; SUB plans attempt to take this into account so that the total of the state and SUB benefits replace the employee’s pre-termination salary. It is easy to imagine why they might wish to do so: by structuring their plans so that employees can receive plan benefits while still remaining eligible for state-provided unemployment benefits, SUB plans potentially improve the terminated employees’ bottom lines, making the benefit more valuable to the employees and therefore to the employer. This is a perfectly rational business decision, but it has nothing to do with providing a “uniform interstate benefit package.”
Having elected to pay a benefit that depends' on state unemployment benefits, SUB plans must then take those state benefits as they find them. An employer can choose to structure its SUB plan to fit with each of many different state programs, or the SUB plan can be structured so that, depending on the employee’s state, benefits may be limited. In this ease, General Dynamics chose to structure the Plan in a way that risked the employee’s right to Minnesota benefits, while advising the employee to apply for and receive Minnesota benefits without characterizing the SUB payments as severance.
Viewed in this light, the majority’s conclusion that Minnesota’s statutory definition of “wages” has a “connection with” an *314 ERISA plan sufficient to support preemption is not well taken. By the majority’s reasoning, severance plans could dictate when, and even by what formula, the state must pay benefits when the employee receives severance payments. The Plan specifies that it will not pay out a greater benefit than the employee’s pre-termi-nation weekly salary reduced by the unemployment compensation payment, but under the majority’s reasoning, a SUB plan could be more generous, allowing a terminated employee to receive a multiple of his weekly pay, and ERISA would still preempt any state definition of wages that “undermines the purpose of a SUB plan to supplement state unemployment benefits” to the higher amount desired by the plan administrator. Indeed, if a plan had the “purpose” of allowing a terminated employee to receive a one-time lump-sum severance payment equal to one year of pay at the pre-termination rate, without affecting the employee’s eligibility for unemployment benefits, the majority’s reasoning would still apply and would bar a state from defining such a payment as severance pay. This cannot be what Congress intended.
The majority also finds preemption to be appropriate based on ERISA’s purpose of permitting “nationally uniform administration of employee benefit plans.” The Supreme Court has advised that “[ujniformity is impossible ... if plans are subject to different legal obligations in different States.” Egelhoff, 532 U.S. at 148, 121 S.Ct. 1322. But Minnesota’s definition of “wages” does not “obligate” severance plans to do anything at all. The definition of wages does not affect the benefits payable under severance plans, when those benefits are payable, to whom they are payable, what consideration must be given to entitle an employee to receive them, or any other details of the payments; all such matters are determined by the relevant plan documents and the plan administrator.[5] Instead, the definition of wages affects only the amount of taxes collected, and benefits paid out, by the State of Minnesota.
Moreover, the entire premise of a SUB plan is that the administrators may (but are not required to) familiarize themselves with the law of each state if they want their plans to pay benefits “supplemental” to state benefits. A SUB plan administrator has no need “to master the relevant laws of the various states,” as the majority complains, unless it wishes to take those laws into account to maximize the ex-employees’ (state unemployment compensation) benefits. Essentially, the majority holds that ERISA requires states to pay uniform unemployment compensation benefits so that it is convenient for SUB plan administrators to design plans to supplement them. Again, Congress cannot have intended this, especially in light of the presumption that Congress did not intend to supplant state law.
There are several additional reasons to believe that Congress had no such intent. First, the entire structure of unemployment insurance is a federal-state partnership that grew out of the Social Security Act. Within this framework, the federal government establishes minimum standards for unemployment compensation *315 programs while the states create and administer their own tax and benefit structures. That framework, which well predates ERISA, would be upset by the majority’s analysis.[6]
Second, the exemption from ERISA for SUB plans maintained solely for the purpose of complying with applicable unemployment compensation laws, see 29 U.S.C. § 1003(b) (2012), while not controlling here, at least suggests that Congress did not intend to limit a state’s ability to decide the scope of, and formula for, state benefits.
Third, as the employee’s Earning Statements from the Plan, which are in the record, show, SUB payments such as these are “income” subject to federal and state tax. How can they not be “wages” here?
Finally, although we have not previously decided the precise issue here, a conclusion that ERISA does not preempt the definition of “wages” fits better with our closest precedent, Gilhousen v. Ill. Farmers Ins. Co., 582 N.W.2d 571 (Minn.1998). In that case, we addressed ERISA preemption in the context of Minnesota’s collateral-source statute, Minn.Stat. § 548.36 (1996), which provided that benefits paid under an ERISA-governed benefit plan constituted a collateral source. Id. at 573 n. 1. We held that ERISA did not preempt the state law because the statute did not impose any administrative or operational requirements upon ERISA plans, but merely affected plan benefits. Id. at 575. The same is true here. The Minnesota unemployment insurance program does not “mandate that certain features be incorporated into ERISA plans,” id., which is forbidden, but affects whether and when state benefits are paid to the employee. If the Minnesota program has any effect on SUB plans, such as the Plan, which has not been shown, the effect is indirect and attenuated.[7]
IV.
I find it difficult to believe that Congress, in adopting ERISA, meant to mandate states to pay particular amounts of unemployment benefits. And I cannot *316 agree with a judicial decision that forces the State of Minnesota’s legislative and executive branches to disregard certain severance payments as the State pays benefits from, and collects taxes for, its unemployment insurance program. For all of these reasons, I respectfully dissent.

. The definition of wages is used for at least two purposes. First, the definition is used to determine whether the unemployed person is eligible for state benefits and, if so, how the benefits are calculated. See Minn.Stat. § 268.07 (2014). Second, the definition is used to trigger and calculate the employer's obligation to pay state unemployment insurance tax. See Minn.Stat. § 268.051 (2014).

. For this reason alone, if for no other, the majority errs in holding that the state law defining “wages” is "connected to” the Plan and thereby preempted by ERISA. Given that the ULJ, the court of appeals, and this court have never even seen the Plan, how can we determine exactly if and how the state law and the Plan are "connected”?

. A state law may also be preempted if it “has a ... reference to" an ERISA plan. Travelers, 514 U.S. at 656, 115 S.Ct. 1671. The Supreme Court has reasoned that “where a [S]tate's law acts immediately and exclusively upon ERISA plans ... or where the existence of ERISA plans is essential to the law’s operation ... that ‘reference’ will result in preemption.” Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). Here, the definition of “wages” in Minn.Stat. § 268.035, subd. 29(a) does not act immediately and exclusively on ERISA plans. Put another way, the existence of an ERISA plan is not essential to the law's operation. Ingersoll-Rand, 498 U.S. at 140, 111 S.Ct. 478. Thus I would hold that the definition of wages in Minn.Stat. § 268.035, subd. 29(a) is not preempted because of a forbidden "reference to” ERISA plans.

. SUB plan administrators know that their plans "generally must comply with state law requirements (which may differ from the IRS’s requirements) and some states are required to approve” such plans. Vicki M. Nielsen, The Advantages of Offering Supplemental Employment Benefits Instead of Severance, Part I: FICA Taxes and More, Ogletree Deakins (Aug. 26, 2013), http://www. ogletreedealdns.com (last visited Aug. 27, 2015). Georgia and Iowa, for example, require that SUB benefits are wages unless the SUB plan is approved in advance. See Ga. Comp. R. & Regs. 300-2-4.05 (2015); Iowa Admin. Code. r.871-23.3(2)(e) (2015),

. To be sure, in this case it appears that in order to determine whether it is proper to make a payment under the Plan, the plan administrator .must determine whether the employee is eligible for state unemployment benefits, and therefore to a certain extent the plan administrator must be familiar with Minnesota’s definition of “wages.” But this requirement is not imposed by the Minnesota definition, but by the Plan itself, which (the majority tells us, although we do not have the Plan before us) "required Engfer to ... be found eligible for state unemployment benefits.”

. There was no right at common law to state unemployment benefits. See Minn.Stat. § 268.069, subd. 3 (2014). Instead, starting with the Social Security Act of 1935, unemployment insurance developed as a “federal-state partnership based upon federal law, but administered by state employees under state law.” U.S. Department of Labor, Unemployment Compensation: Federal-State Partnership 1 (2014) (Federal-State Partnership). “Each state designs its own UC [unemployment compensation] program within the framework of the federal requirements. The state statute sets forth the benefit structure (e.g., eligibility/disqualification provisions, benefit amount) and the state tax structure (e.g., state taxable wage base and tax rates).” Id.
While the Secretary of Labor approves state unemployment insurance laws to assure that they comply with federal law, see 26 U.S.C. §§ 3303-3304 (2012), such laws vary widely from state to state.- There are “many variables in states[’] taxable wage bases and rates, benefit formulas, and economic condi-tions_” Federal-State Partnership, at 10. "There are no federal standards for benefits in terms of qualifying requirements, benefit amounts, or duration of regular benefits. Hence, there is no common pattern of benefit provisions comparable to that in coverage and financing. The states have developed diverse and complex formulas for determining workers’ benefit rights.” Id. at 11.

. Along the same lines, see Hewlett-Packard Co. v. Diringer, 42 F.Supp.2d 1038 (D.Colo.1999) (ERISA does not preempt state law that requires employers to include the value of ERISA-plan benefits in calculating wages for worker's compensation purposes); Lawrence Paper Co. v. Gomez, 257 Kan. 932, 897 P.2d 134 (1995) (same); Farrell v. Am. Heavy Lift Shipping Co., 805 So.2d 336 (La.App.2001) (ERISA does not preempt state law defining wages for unemployment compensation to include lump-sum vacation pay).