**STATE of Alaska, Petitioner,**

v.

**Marie ARNARIAK, Respondent.**

**STATE of Alaska, Petitioner,**

v.

**Adam ARNARIAK, Respondent.**

No. S-7097.

Supreme Court of Alaska.

June 27, 1997.

Kevin M. Saxby, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Petitioner.

Frederick Torrisi, Dillingham, for Respondent Marie Arnariak.

David B. Snyder, Assistant Public Defender, Dillingham, John B. Salemi, Public Defender, Anchorage, for Respondent Adam Arnariak.

Before COMPTON, C.J., RABINOWITZ, MATTHEWS, EASTAUGH, JJ., and SHORTELL, Justice pro tem.*

*OPINION*

MATTHEWS, Justice.

Round Island is an island owned by the State of Alaska and located in Bristol Bay. It is part of the Walrus Islands State Game Sanctuary which was established in 1960. AS 16.20.092. No one may enter Round Island without a permit; hunting and the discharge of firearms are prohibited.[1]   5 AAC 92.066 (1995); 5 AAC 92.510(a)(13) (1995).

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. The legislative findings and purpose of the Walrus Island State Game Sanctuary are expressed in AS 16.20.090 as follows:

    (a) The legislature recognizes that

    (1) the Walrus Islands are the sole remaining place in the state where walruses annually haul out on land and all similar "hauling grounds" in the state which were formerly utilized have been abandoned by walruses due to excessive molestation and slaughter;

    (2) the Walrus Islands are uninhabited, and the walruses frequenting them are not required by the state for subsistence utilization;

    (3) the Walrus Islands have great importance as a retreat for the Pacific walrus from the standpoints of conservation, scientific value, and tourist interest;

    (4) the Department of Natural Resources has taken appropriate action to achieve transfer of title in the Walrus Islands to the state.

    (b) The purpose of AS 16.20.090–16.20.098 is to protect the walruses and other game on the Walrus Islands.

Adam and Marie Arnariak have been charged with entering Round Island without a permit and Adam has been charged with the unlawful discharge of a firearm on the island. *See State v. Arnariak,* 893 P.2d 1273, 1274 (Alaska App.1995). All charges are violations of 5 AAC 92.066.

The Arnariaks moved for the dismissal of these charges, arguing that the regulation on which they are based was preempted by the federal Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361–1407. *Id.* The MMPA prohibits the taking of marine mammals and provides that "[n]o State may enforce, or attempt to enforce, any State law or regulation relating to the taking of any species ... of marine mammal within the State." 16 U.S.C. § 1379(a). The MMPA exempts certain Alaska Natives from the act when they harvest marine mammals for certain purposes. 16 U.S.C. § 1371(b) ("[T]he provisions of this chapter shall not apply with respect to the taking of any marine mammal by any Indian, Aleut, or Eskimo who resides in Alaska and who dwells on the coast of the North Pacific Ocean or the Arctic Ocean if such taking—(1) is for subsistence purposes; or (2) is done for purposes of creating and selling authentic native articles of handicrafts and clothing. . . .").

The district court granted the Arnariaks' motion to dismiss. The court of appeals affirmed. *Arnariak,* 893 P.2d at 1277. We granted the State's petition for hearing and now reverse.

In order to conclude that MMPA preempts the regulations which prohibit entry onto Round Island without a permit and prohibit the discharge of firearms on Round Island, it would be necessary to accept the conclusion that Congress, by enacting section 1379(a),

intended to preclude the State from barring entry onto state property and from barring the discharge of firearms on state property. In our view, such a conclusion is unwarranted.

■ The State has the right to exclude entry onto its property and the right to prohibit certain activities from being conducted thereon. State property is protected from federal takings under the Fifth Amendment to the United States Constitution just as private property is. *United States v. 50 Acres of Land,* 469 U.S. 24, 31, 105 S.Ct. 451, 455–56, 83 L.Ed.2d 376 (1984); *Adderley v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966); *California v. United States,* 395 F.2d 261, 263–64 (9th Cir.1968). A governmental attempt to require public access to private property is unconstitutional and invalid unless the government first follows the condemnation process and pays just compensation. *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 831–32, 107 S.Ct. 3141, 3146, 97 L.Ed.2d 677 (1987) (A permanent physical occupation will be deemed to have occurred "where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises."); *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 393, 62 L.Ed.2d 332 (1979) ("In this case, we hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation."); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415–16, 43 S.Ct. 158, 159–60, 67 L.Ed. 322 (1922).[2] It follows that section 1379(a) would

---

2. *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), is arguably contrary authority, but we think it is distinguishable for the reasons that follow. *PruneYard* held that a state may require a privately owned shopping center, open to the general public, to permit individuals to exercise rights of free expression on the shopping center's property. Round Island is not open to the general public; access is limited to no more than 30 persons a day and only between May 1 and September 1. The PruneYard Shopping Center attracted 25,000 persons a day. *Id.* at 78, 100

S.Ct. at 2039. *See, Nollan v. California Coastal Comm'n,* 483 U.S. 825, 832 n. 1, 107 S.Ct. 3141, 3145 n. 1, 97 L.Ed.2d 677 (1987); *Pacific Gas & Elec. v. Public Util. Comm'n of California,* 475 U.S. 1, 12 n. 8, 106 S.Ct. 903, 910 n. 8, 89 L.Ed.2d 1 (1986) (plurality opinion). Unlike the pamphleteering in *PruneYard,* unrestricted hunting conflicts with the State's goals in maintaining the Round Island Sanctuary. Preventing the State from "prohibiting this sort of activity will unreasonably impair the value or use of [the] property as a [sanctuary]." *PruneYard,* 447 U.S. at 83, 100 S.Ct. at 2042. The MMPA would

be unconstitutional were it interpreted to require the State to permit access to and the discharge of firearms on Walrus Island.

Statutes should be construed in a manner which avoids a substantial risk of unconstitutionality, where such a construction is reasonable. *Concrete Pipe and Products, Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 627–30, 113 S.Ct. 2264, 2282–83, 124 L.Ed.2d 539 (1993); *Kenai Peninsula Borough v. Cook Inlet Region, Inc.,* 807 P.2d 487, 498 (Alaska 1991). We follow this precept in this case and interpret section 1379(a) not to preclude the State from restricting access to or from prohibiting the discharge of firearms on state land. The language of section 1379(a) will reasonably bear this interpretation. It preempts regulations "relating to the taking" of marine mammals. Whether the phrase "relating to the *taking*" extends to regulations protecting marine mammals on state-owned land is a question which cannot be conclusively answered merely by reference to the language of section 1379(a).

The legislative history of MMPA, however, does give an authoritative answer to this question. The report of the Committee on Merchant Marine and Fisheries of the House of Representatives concerning MMPA makes clear that the act was not intended to interfere with state sanctuaries which protect marine mammals. The report states: "It is not the intention of this Committee to foreclose effective state programs and *protective measures such as sanctuaries* . . . ." H.R.Rep. No. 92–707, at 28 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4161 (emphasis added).[3]

The MMPA is designed to protect marine mammals "to the greatest extent feasible." 16 U.S.C. § 1361. "The purpose of this legislation is to prohibit the harassing, catching and killing of marine animals. . . ." H.R.Rep. No. 92–707, at 11 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4144.[4] The text of the act identifies as its "major objective" the prevention of stocks of marine mammals from diminishing "beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part. . . ." 16 U.S.C. § 1361(2). The act also recognizes the need "to protect essential habitats, including the rookeries, mating grounds, and areas of similar significance for each species of marine mammal from the adverse effect of man's actions. . . ." *Id.* In

prohibit any State imposed restrictions on walrus hunting on the property. The *PruneYard* decision emphasized that the owner was not restricted from imposing "reasonable time, place and manner restrictions to minimize interference with the owner's commercial functions." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 434, 102 S.Ct. 3164, 3175, 73 L.Ed.2d 868 (1982). *See also, Dolan v. City of Tigard,* 512 U.S. 374, 394, 114 S.Ct. 2309, 2321, 129 L.Ed.2d 304 (1994) ("Petitioner would lose all rights to regulate the time in which the public entered onto the Greenway, regardless of any interference it might pose with her retail store. Her right to exclude would not be regulated, it would be eviscerated.").

3. Similarly, the report states: "There is no intention or desire within the Committee to remove any incentive from the states . . . to protect animals residing within their jurisdictions. . . ." H.R.Rep. No. 92–707, at 18 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4151.

4. As noted, the act exempted from its coverage subsistence hunting by Alaska Natives. 16 U.S.C. § 1371(b). Logically, this exemption indicates a Congressional policy that MMPA not interfere with marine mammal hunting by Alaska Natives. It is not a mandate requiring land owners to open their land to such activities. The legislative history of MMPA supports the view that "present levels of taking" by Alaska Natives were to be protected, but the expansion of hunting areas was not contemplated:

The House bill exempted Alaskan Indians, Aleuts and Eskimos from the moratorium and the permit requirements to the extent they take an animal for subsistence purposes, not wastefully and not for direct or indirect commercial sale. The Senate amendment extended the exemption to allow for the so-called "cottage industries" of the Alaskan natives. The House bill would prohibit the taking, by natives or anyone else, of animals belonging to an endangered species, whereas the Senate amendment would allow such animals to be taken by natives. The conferees essentially adopted the provisions of the Senate amendment.

The conferees were aware of the relatively small amount of solid data on the effects of native taking of marine mammals, and given that lack of information *were not disposed unilaterally to terminate the present levels of taking by Alaskan Indians, Aleuts and Natives of marine mammals,* including endangered species such as bowhead whales.

H.R.Conf.Rep. No. 92–1488, at 23 (1972) (emphasis added).

view of these expressions of purpose, it is difficult to believe that Congress also intended a meaning which would preclude the State from continuing to maintain a walrus sanctuary on state-owned islands which had previously been recognized as "the sole remaining place in the state where walruses annually haul out on land" because "all similar 'hauling grounds' ... have been abandoned by walruses due to excessive molestation and slaughter...." AS 16.20.090(a)(1).

We are aware that Congress's use of the phrase "relating to" in an express preemption clause has been held to suggest a broad scale preemption. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 2036–37, 119 L.Ed.2d 157 (1992); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 1552–53, 95 L.Ed.2d 39 (1987). *See also American Airlines, Inc. v. Wolens,* 513 U.S. 219, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). However, this, at most, is merely one guide to the meaning or intended scope of an enactment; it does not necessarily control where there is evidence that another meaning was intended, or where other rules of construction are also applicable. Here the legislative history, the purpose of MMPA, and the rule that statutes should be construed to avoid an unconstitutional result persuasively indicate that MMPA's preemption is not so broad as to prevent the State from limiting access to, or the discharge of firearms on, state wildlife refuges.

■■■ There is, in addition, another rule of construction which supports our conclusion. This is the presumption against finding federal preemption in areas traditionally regulated by the states. In *Totemoff v. State,* 905 P.2d 954, 966 (Alaska 1995), we noted:

> The clear statement doctrine "counsels that a ... court should not apply a federal statute to an area of traditional state concern unless Congress has articulated its desire in clear and definite language to alter the delicate balance between state and federal power by application of the statute to that area."

(Quoting *H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 495 n. 6 (8th Cir.1992)). The regulation of state lands is a traditional state function. *See EEOC v. Wyoming,* 460 U.S. 226, 239, 103 S.Ct. 1054, 1061–62, 75 L.Ed.2d 18 (1983) ("The management of state parks is clearly a traditional state function...."). Congress has not manifested in the MMPA in clear and definite language a desire to displace the State's ability to ban certain activities in state wildlife sanctuaries.

For the above reasons we conclude that the MMPA does not preclude the State from limiting access to, or the discharge of firearms on, Round Island. The opinion of the court of appeals is REVERSED and this case is REMANDED with directions to reverse the decision of the district court and to remand this case to the district court for further proceedings.

COMPTON, C.J. and RABINOWITZ, J., concur.

SHORTELL, Justice pro tem, dissents.

COMPTON, Chief Justice, concurring.

I agree that 16 U.S.C. § 1379(a) does not preclude the State from restricting access to or from prohibiting the discharge of firearms on State land. In other words, the State has not been preempted from acting because of the federal statute. On this basis, I concur in the result.

I see no need for this court to address the issue of whether were preemption found, section 1379(a) would be unconstitutional as a taking without just compensation. I express no opinion regarding that issue.

RABINOWITZ, J., concurring.

Although I agree with Justice Shortell's dissenting conclusion that the Marine Mammal Protection Act preempts Alaska's regulations which prohibit entry onto Round Island without a permit and prohibit the discharge of firearms on Round Island, I concur in the result reached by the court. By preventing the State of Alaska from excluding hunters from its property, the Act effects an uncompensated taking in violation of the Fifth Amendment of the United States Constitution.

The Act evidences a clear intent to preempt the type of state regulation at issue in this case. Section 1379(a) announces that

"[n]o State may enforce ... any State law or regulation relating to the taking of any species ... of marine mammal." The United States Supreme Court has indicated that such "relating to" language in preemption clauses need not be read broadly. In *California Division of Labor Standards v. Dillingham Construction,* — U.S. —, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997), the Court refused to displace a state law on the basis of an identical provision. A separate concurring opinion suggests that in practice, "relating to" language only requires ordinary field and conflict preemption analysis. *Id.* at —, 117 S.Ct. at 843, 136 L.Ed.2d at 806 (Scalia, J., concurring).

Here, however, even an application of the established preemption tests would require preemption of state regulations. Alaska regulation 5 AAC 92.066(2)(D) prohibits the "discharge of firearms, disturbance or harassment of wildlife, removal of wildlife or parts of wildlife" on the Round Island sanctuary. The regulation governs the taking of marine mammals, a field which the Act is intended to occupy. In addition to its express preemption provision, the Act creates a comprehensive regulatory system of the sort that assumes an absence of competing rules. *See* §§ 1371, 1373, 1374, 1381, and 1383. Therefore, a field preemption analysis would require the invalidation of the regulation under which the Arnariaks were charged. *See Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

The court's opinion and the dissent quote contradictory legislative history as to the intended effect of the Act. In my opinion the most revealing history is found in the House of Representative's section-by-section analysis of the original bill. The report directs:

> If the U.S. activities are impaired by reason of a failure to own the necessary lands or interests therein, the Secretary must thereupon suspend the program and notify the Congress, recommending such additional legislation is [sic] deemed necessary.

H.R.Rep. No. 92–707, at 29 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4161.

This passage indicates Congress was aware of the Act's possible constitutional infirmity. Unsure of whether the proposed legislation would run afoul of Fifth Amendment property rights, Congress apparently chose to move forward and let the issue be resolved in the courts. The question we are faced with in this case is not whether the Act was intended to apply to land owned by others; rather, it is whether such an extension constitutes an uncompensated taking.

I agree with the court that a federal denial of the state's right to exclude hunters from its game sanctuary would be a taking. Since section 1379(a) requires the State of Alaska to permit access to and the discharge of firearms on Round Island without compensation, I conclude that the Act is unconstitutional.

The United States Supreme Court has rejected takings challenges to laws that require owners who open their land to the public to admit other private persons. *See e.g., Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258–61, 85 S.Ct. 348, 358–60, 13 L.Ed.2d 258 (1964) (rejecting takings challenge to Title II of 1964 Civil Rights Act). With one exception, though, the Supreme Court has only sustained requirements of admission for persons who enter with the same purpose for which the owner admits other members of the public. The cases have all involved prohibitions on discrimination among entrants. They do not suggest a landowner may be made to suffer an entry such as that made by the Arnariaks, whose entry was unrelated to the state's reasons for opening its property.

The one exception to this rule is *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). There the Supreme Court held that a state may force private shopping malls to allow pamphleteers to operate on their premises. Although the mall at issue was open only "for the purpose of encouraging the patronizing of its commercial establishments," and it did not allow expressive activity, the Court found the access requirement did not constitute a taking. *Id.* at 77, 100 S.Ct. at 2038.

As this court's opinion points out, entry was allowed in *PruneYard* under a set of conditions that distinguish the present case. Op. at 156–157 n. 2. The most important condition was that the shopping mall was allowed to impose its own time, place, and manner restrictions, to guarantee that the entry did not interfere with its land use objectives. *PruneYard*, 447 U.S. at 83–84, 100 S.Ct. at 2041–42.

This condition is critical. The Arnariaks contend that Native hunting does not interfere with species preservation, and that federal regulation will meet the state's objectives. However, even under *PruneYard*, the State retains the right to determine for itself when, where, and how hunting may be conducted. As the landowner, it may act on its own to ensure that subsistence taking will not interfere with its preservationist goals. Furthermore, since the state may regulate "place," it may bar hunting in some places. Just as the mall owners in *PruneYard* were able to restrict pamphleteers to common areas, so too should Alaska be allowed to keep hunters out of its game sanctuaries.[1]

In short, I conclude that the Marine Mammal Protection Act preempts the State of Alaska hunting regulations under which the Arnariaks were charged. Although statutes and regulations must be construed when possible to avoid constitutional infirmity, "[h]ere the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power." *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 478, 77 S.Ct. 923, 932, 1 L.Ed.2d 972 (1957) (Frankfurter, J., dissenting) (quoting *Hopkins Federal Sav. & Loan Ass'n v.*

*Cleary*, 296 U.S. 315, 335, 56 S.Ct. 235, 240, 80 L.Ed. 251 (1935)). However, I further conclude that as such, the Marine Mammal Protection Act violates the Fifth Amendment of the United States Constitution. Even under a liberal reading of the Supreme Court's takings cases, the fact that Alaska permits tourists to enter Round Island to shoot pictures does not allow Congress to require Alaska to permit others to enter to shoot walrus.

SHORTELL, Justice *pro tem*, dissenting.

I dissent from the court's decision because I do not agree that a broad reading of the MMPA's preemption clause would frustrate the act's purpose and be contrary to Congress's intent. Op. at 158. The MMPA's preemption clause prohibits Alaska from enforcing any state law or regulation "relating to" the taking of walruses.[1] 16 U.S.C. § 1379(a). By referring to the MMPA's legislative history, the court interprets "relating to" narrowly and concludes that the MMPA does not preempt Alaska regulations aimed at protecting marine mammals. Op. at 157–158. The court also discards a line of cases in which the United States Supreme Court consistently has interpreted the words "relating to" in preemption clauses to "express a broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992). I do not agree that the MMPA's legislative history provides an authoritative basis for deviating from this well-established rule of construction. Nor do I agree that the "clear statement doctrine" requires a narrow interpretation of "relating to." Thus, I

---

1. Although *PruneYard* does not mention this as a basis for decision, it would appear that the Supreme Court's holding was influenced by free speech concerns. In many suburban areas, private shopping centers have displaced traditional fora for expressive activity. *See id.* at 90, 100 S.Ct. at 2045 (Marshall, J., concurring). *PruneYard* in effect allowed limited public duties to be imposed on a private entity that had displaced public institutions. *Cf. Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). The fact that the Supreme Court has never allowed *separate-purpose private entry elsewhere* suggests that *PruneYard*'s exception to traditional limits on governmental power can be limited to such circumstances.

1. The preemption clause provides:

    No State may enforce or attempt to enforce, any State law or regulation relating to the taking of any species ... of marine mammal within the State unless the Secretary has transferred authority for the conservation and management of that species ... to the State under subsection (b)(1) of this section.

    16 U.S.C. § 1379(a). The State does not dispute the court of appeals' conclusion that "[t]he federal government has not transferred management authority for marine mammals to the State of Alaska." *State v. Arnariak*, 893 P.2d 1273, 1275 (Alaska App.1995).

would affirm the court of appeals' decision by interpreting "relating to" broadly and concluding that the MMPA preempts all Alaska regulations "relating to the taking of" walruses, even if those regulations protect walruses.

### A. The Structure and Legislative History of the MMPA Mandate a Broad Interpretation of "Relating to" in § 1379.

To conclude that preempting Alaska's walrus sanctuary regulations would be contrary to Congress's intent, the court assumes that the overriding purpose of the MMPA is to protect marine mammals. Op. at 157–158. Certainly, marine mammal protection is the "major objective" of the act. 16 U.S.C. § 1361(2). However, protection was not Congress's exclusive objective. Instead, the MMPA's structure and legislative history indicate that several objectives concerned Congress when it enacted the MMPA. For example, Congress structured the act to provide a balance between protecting marine mammals and addressing the needs of Alaska Natives by imposing a moratorium on taking marine mammals, but providing a limited exemption from the moratorium for Alaska Natives. See 16 U.S.C. § 1371(a)–(b).

The MMPA's legislative history reflects this balance. The preamble to the report accompanying the House bill that became the MMPA states that the bill was drafted "to protect marine mammals; to establish a Marine Mammal Commission; and for other purposes." H.R.Rep. No. 92–707 (1971), reprinted in 1972 U.S.C.C.A.N. 4144, 4144 [hereinafter H.R.Rep.] (emphasis added). That report further elucidates the variety of concerns motivating the bill by outlining the "concepts" addressed by the bill's provisions. Id. at 4151. On the one hand, the report recognizes the protective functions of the bill: "Before any marine mammal may be taken, the appropriate Secretary must first establish general limitations on the taking, and must issue a permit which would allow that taking." Id. On the other hand, "[t]he bill establishes reasonable protection for Alaskan natives taking marine mammals for purposes of food or clothing, where the primary purpose is not commercial sale." Id.

No portion of the act or its legislative history suggests that Congress intended to permit Alaska to enforce regulations that would upset this balance, even if those regulations provided strong protections for marine mammals. Indeed, a narrow interpretation of the MMPA's preemption clause would thwart specific provisions included in § 1379(b)(1) of the MMPA to ensure that no state law would frustrate any of the multiple objectives addressed in the act. Section 1379(b)(1) sets forth several criteria that a state must meet before gaining authority to enforce its laws relating to the taking of walruses. Of those criteria, the very first requires states to have developed "a program for the conservation and management of [walruses] that ... is consistent with the purposes, policies, and goals of this chapter." 16 U.S.C. § 1379(b)(1)(A) (emphasis added). Under the court's ruling, a state such as Alaska that has not attained management authority for walruses could nevertheless enforce regulations that do not conform to all of the MMPA's purposes, policies, and goals so long as those regulations protect walruses. Congress surely could not have intended to allow Alaska to make such an end run around the requirements of § 1379(b)(1).

The legislative history upon which the court relies also supports a broad reading of § 1379(a). The court points out that the House of Representatives report accompanying the bill that later became the MMPA states: "There is no intention or desire within the Committee to remove any incentive from the states to carry out necessary research or to protect animals residing within their jurisdictions." Op. at 157 n. 3. However, that language does not compel the interpretation of § 1379 espoused by the court. If the MMPA preempted Alaska's walrus sanctuary regulations, Alaska would continue to have a strong, if not stronger, incentive to enact laws that conform to the objectives of the MMPA. In fact, only by enacting such laws could Alaska regain the power to manage the marine mammals within its borders. See 16 U.S.C. § 1379(a)–(b)(1).

Moreover, the context of the sentence cited by the court indicates that Congress intended to permit states to enforce their laws so long as they do so in a way that is consistent with the MMPA. The sentence the court cites appears immediately after a sentence that provides: "The bill permits and indeed requires the development of an extensive management program in the agencies concerned, with full opportunity for cooperative federal-state management programs *designed to carry out the purposes and policies of the act.*" H.R.Rep., *supra* p. 2, at 4151. Therefore, I disagree with the majority's conclusion that this portion of the legislative history suggests a congressional intent to allow Alaska to enforce measures that ignore all but the protective functions of the MMPA.

The court also refers to a portion of the House report's section-by-section analysis, which states that "[i]t is not the intention of this Committee to foreclose effective state programs and protective measures such as sanctuaries." Op. at 157. This part of the section-by-section analysis relates to section 109 of the House bill. H.R.Rep., *supra* p. 2, at 4161. However, Congress did not enact the House's version of section 109. Conf. Rep. No. 92–1488 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4187, 4188. Instead, a House and Senate conference committee modified the House's version of section 109 to conform to amendments proposed by the Senate. *Id.* Thus, the portion of the legislative history cited by the court is of limited value in interpreting Congress's intent.

A more appropriate gauge of Congress's actual intent is the legislative history discussing the conference committee's version of section 109. The conference report explains:

> The House bill preempted State law, but allowed cooperative agreements with the States in harmony with the purposes of the Act. The Senate amendment allowed the Secretary to review State laws and to accept those that are consistent with the policy and purpose of the Act. The conference substitute clarifies the Senate version

to assure that the Secretary's determination will control as to whether or not the State laws are in compliance. Once granted authority to implement its laws relating to marine mammals, the State concerned may issue permits, handle enforcement, and engage in research.

*Id.* at 4190. Thus, rather than supporting the court's interpretation of § 1379(a), this portion of the legislative history is consistent with the view that Congress intended to preempt state laws that are inconsistent with the multiple policies and objectives of the act.

Finally, the court refers to § 1361, which provides that the MMPA "is designed to protect marine mammals 'to the greatest extent feasible.'" Op. at 157. However, this language is not inconsistent with the view that Congress sought to protect marine mammals while also addressing concerns it had about Alaska Natives. Congress expressly qualified the protection it was willing to provide marine mammals with the nebulous expression "to the greatest extent feasible." 16 U.S.C. § 1361(6). Although Congress never explained when protection would not be "feasible," the phrase reasonably could be interpreted to mean that protecting marine mammals is not "feasible" when such protection conflicts with Congress's other concerns expressed in the MMPA. It is difficult to imagine that by this one imprecise phrase Congress intended to permit state laws that might frustrate one of the MMPA's objectives.

Thus, I conclude that the structure and legislative history of the MMPA do not support the court's interpretation of "relating to" in § 1379(a). Congress consistently indicated that the MMPA would preempt state laws so that no law would upset the balance that Congress struck between competing interests. I cannot agree with the court's narrow interpretation of "relating to" because it would permit Alaska to protect marine mammals at the expense of some of the other interests that Congress recognized when it enacted the MMPA.[2]

---

**2.** In a footnote, the court refers to legislative history concerning Alaska Native subsistence taking and concludes that Congress intended to protect present levels of taking without expand-

ing hunting areas. Op. at 157 n. 4. That portion of the legislative history states that "[t]he conferencees were ... not disposed unilaterally to terminate the present levels of taking by Alaskan

B. *Under a Broad Interpretation of § 1379(a), 5 Alaska Administrative Code (AAC) 92.066 Relates to the Taking of Walruses.*

As § 1379(a) preempts state protective measures that relate to the taking of walruses, the question becomes whether 5 AAC 92.066, the particular regulation under which the State charged the Arnariaks, falls within the ambit of § 1379(a). The MMPA defines "take" as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(12). It does not define "relating to." And, aside from the court of appeals' decision in this case, no court has clarified the meaning of "relating to" in § 1379(a). However, in examining similar provisions in the Employee Retirement Income Security Act (ERISA) and the Airline Deregulation Act (ADA), the United States Supreme Court consistently has employed the broad, ordinary meaning of the words: "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)).[3]

These authorities persuade me that the regulations at issue in this case relate to the taking of walruses. Those regulations are part of a regulatory structure intended to establish and maintain a wildlife sanctuary on the Walrus Islands, including Round Island. *See* 5 AAC 92.066. The State correctly points out that "[s]hortly after statehood, Alaska's Legislature created the sanctuary because it found that the Walrus Islands were the sole remaining place in Alaska

where walruses annually haul out on land." *See* Ch. 115, § 1, SLA 1960. The regulations, thus, protect the Round Island walruses by prohibiting hunting on Round Island, establishing procedures to control access to the island, and ensuring that visitors do nothing to compromise wildlife habitats or otherwise disturb or harass wildlife present on the island. *See* 5 AAC 92.066; 5 AAC 92.510(13).

The regulations at issue in this case relate to the taking of walruses because they are part of this protective statutory and regulatory structure. Indeed, the similarities between the MMPA's definition of "take" and the actions prohibited by 5 AAC 92.066 are striking because both prohibit persons from harassing, killing, or removing walruses. *Compare* 5 AAC 92.066(2) *with* 16 U.S.C. § 1362(12). And, the permit requirement and the firearm restriction in 5 AAC 92.066 exist to protect walruses from such activities. *See* 5 AAC 92.066. Therefore, I dissent from the court's view that 5 AAC 92.066 is not a regulation "relating to the taking of" walruses for preemption purposes.

C. *The Takings Clause Does Not Require the Court's Interpretation of § 1379(a).*

I do not agree with the court that potential Takings Clause issues compel an interpretation of § 1379(a) that would permit the State to enforce 5 AAC 92.066. Op. at 158. I agree that a taking in the constitutional sense might occur if the MMPA limited the State's right to exclude others from its property to the same extent as the government action in *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).[4] But I disagree that

Indians, Aleuts and Natives of marine mammals." Conf.Rep. No. 92–1488 (1971), *reprinted in* 1972 U.S.C.C.A.N. 4187, 4188. Just because Congress did not want to terminate "present levels" does not necessarily mean Congress intended to bar any increase in the level of Native subsistence taking. However, even if Congress did have that intent, maintaining current levels of taking does not require the size of hunting areas to stay the same. That is, the size of hunting areas may fluctuate independently from levels of taking.

**3.** In his concurring opinion, Justice Rabinowitz cites *California Division of Labor Standards En-*

*forcement v. Dillingham Construction, N.A.,* —— U.S. ——, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997), for the proposition that "relating to" need not be read broadly. In that case, the United States Supreme Court reaffirmed its view that "relate to" in ERISA is "clearly expansive," has a "broad scope," and is "conspicuous for its breadth." *Dillingham,* —— U.S. at ——, 117 S.Ct. at 837 (citations omitted).

**4.** In *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), the Court noted that

where governmental action results in "[a] permanent physical occupation" of the property,

§ 1379(a) would create a "permanent physical occupation" in the sense that the Court used that term in *Nollan,* 483 U.S. at 832, 107 S.Ct. at 3146, if § 1379(a) were interpreted to preempt 5 AAC 92.066.

The State argues that "the Court of Appeals' construction of the MMPA ... compel[s] [the State] to suffer uncontrolled, unwanted physical invasion of its property, without recourse." This position makes no distinction between the State's power to enforce the permit requirement in 5 AAC 92.066 and its general power to prevent trespass. I disagree that these two powers are coextensive.

All property owners possess a common law right to prevent trespasses upon their land. *See Brown Jug, Inc. v. International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local 959,* 688 P.2d 932, 938 (Alaska 1984); *Restatement (Second) of Torts* §§ 163–65 (1965) (describing liability for intentional, mistaken, reckless, and negligent trespass to land). The State's power to enforce this right, of course, exists separately from the State's power to prosecute violations of 5 AAC 99.066. Therefore, the issue is whether § 1379(a) necessarily preempts the State's general right to prevent trespass if, as I have concluded previously, that provision preempts 5 AAC 92.066.

Although the United States Supreme Court has interpreted preemption clauses like § 1379(a) broadly, it has recognized limits to the reach of such clauses.[5] *See Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 139, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990) ("Notwithstanding its breadth, we have recognized limits to ERISA's pre-emption clause."). For example, in *Mackey v. Lanier Collection Agency & Serv.,* 486 U.S. 825, 829, 831–38, 108 S.Ct. 2182, 2186–90, 100 L.Ed.2d 836 (1988), the Court examined whether ERISA's preemption clause, which supersedes all state laws that "relate to any employee benefit plan," preempted a state's general garnishment statute that was applied to collect judgments against participants in employee benefit plans. The Court noted that the garnishment statute was generally applicable and did not refer to ERISA plans of any kind. *Id.* at 831, 108 S.Ct. at 2186. It also reasoned that ERISA could not preempt the garnishment statute without creating an unreasonable result because preemption would mean that a party would have no way to enforce a judgment that it might win in certain suits expressly authorized by ERISA. *Id.* at 834, 108 S.Ct. at 2187–88. Therefore, it concluded that ERISA did not preempt the garnishment statute. *Id.* at 841, 108 S.Ct. at 2191–92.

In this case, interpreting § 1379(a) to preempt the State's general right to prevent trespass might very well create an unreasonable result. If the State could not enforce that general right, the Arnariaks might be able to take a walrus located in a high security area or even a zoo, so long as the State owned the land in question. Congress surely could not have intended such an absurd result. *See* Norman J. Singer, 2A *Sutherland Statutory Construction* § 46.07 (5th ed. 1991) (stating that statutes should be construed to avoid absurd results).

Thus, the MMPA cannot reasonably be interpreted to prevent the State from using its general right to prevent trespass to ex-

---

by the government itself or by others, "our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Id.* at 831–32, 107 S.Ct. at 3146 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 432–35, 102 S.Ct. 3164, 3174–76, 73 L.Ed.2d 868 (1982) (citations omitted)). Then, it determined that
> a "permanent physical occupation" has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though

no particular individual is permitted to station himself permanently upon the premises.
*Id.* at 832, 107 S.Ct. at 3146.

**5.** The "relating to" language poses a difficult interpretational issue because "as many a curbstone philosopher has observed, everything is related to everything else." *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A.,* — U.S. —, —, 117 S.Ct. 832, 843, 136 L.Ed.2d 791 (1997) (Scalia, J., concurring). The problem, therefore, is to find a limit to language that appears, at first glance, to be unlimited.

clude persons from Round Island. Interpreted in this way, § 1379(a) would not violate the Takings Clause. If § 1379(a) is not so broad as to supersede the State's ability to enforce its general right to prevent trespass, the MMPA would not unconstitutionally impinge on the State's right to exclude others from its property.[6]

### D. The "Clear Statement Doctrine" Does Not Require the Court's Interpretation of § 1379(a).

Finally, I disagree that the "clear statement doctrine" as articulated in *Totemoff v. State*, 905 P.2d 954 (Alaska 1995), supports the court's interpretation of § 1379(a). In *Totemoff*, this court determined whether the Alaska National Interest Lands Conservation Act (ANILCA) deprived the State of criminal jurisdiction over a hunter who, contrary to a state ban on hunting with the aid of a spotlight, shot a deer on federal land from a skiff located in navigable waters. *Totemoff*, 905 P.2d at 957–58. This court noted that State jurisdiction could be "established either by finding that the State has the power to apply the spotlighting ban to subsistence hunters on federal land, or by determining that the State has exclusive jurisdiction over the navigable waters from which [the hunter] fired his rifle." *Id.*

In determining whether the State has the power to apply the spotlighting ban on federal land, the court examined whether ANILCA preempted the state hunting regulation. *Id.* at 958. It noted that ANILCA does not contain an express preemption clause. *Id.* at 959. Moreover, the court's opinion contains no discussion of legislative history that refers to preemption of any nature, suggesting that ANILCA's legislative history makes no such specific mention. Indeed, the court recognized that ANILCA states: "Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of

Alaska for management of fish and wildlife on the public lands except as may be provided in [Title VIII] of this chapter." *Id.* at 959. Under these circumstances, it is not surprising that the court found Congress had not expressed a "clear and manifest" intent to create a federal regulatory scheme "so pervasive that there would be no room for state regulation to supplement it." *Id.*

As to whether the State had exclusive jurisdiction over navigable waters, the court examined whether ANILCA gives the federal government the power to regulate hunting in navigable waters. *Id.* at 962. Because neither ANILCA nor its legislative history apparently contained any express authority for resolving this issue, the court resorted to determining whether federal jurisdiction could be inferred from the language of ANILCA. *See id.* at 962–68.

Thus, the issue became whether ANILCA's definition of "public lands" includes navigational servitudes and reserved water rights belonging to the United States. *Id.* at 961–68. If it did, ANILCA might have prevented the state from enforcing the spotlighting law. *Id.* at 957–58, 961. The court noted that ANILCA defined "land" as "lands, waters, and interests therein." *Id.* at 962. It concluded that the state law was not preempted for several reasons, one of which was that use of the word "interests" in the definition of "land" was not a sufficiently clear and definite statement of Congress's intent to make the federal government responsible for regulating hunting and fishing in Alaska's navigable waters. *Id.* at 964.

Unlike ANILCA, the MMPA contains an express preemption clause, and this clause is clarified by the MMPA's structure and legislative history. As discussed in Part A, the preemption clause in § 1379(a) works in conjunction with the criteria in § 1379(b)(1) for

---

**6.** The general right to prevent trespass is distinguishable from the walrus sanctuary regulations. The MMPA preempts "any state law or regulation relating to the taking of" walruses. 16 U.S.C. § 1379(a). Based upon this language, the proper inquiry is whether the law or regulation itself, rather than a reason for enforcing it, relates to walrus taking. As discussed in Part B, the walrus sanctuary regulations themselves relate to taking because they are part of a regulatory structure specifically intended to establish and maintain an area to protect Round Island walruses from the same type of activities that the MMPA characterizes as "taking." Because the general right to prevent trespass does not share these features, it is critically different from the walrus sanctuary regulations.

transferring authority to Alaska for managing walruses. Specifically, subsection (a) preempts state laws and regulations relating to walrus taking "unless the Secretary has transferred authority for the conservation and management of [walruses] ... to the State under subsection (b)(1) of this section." 16 U.S.C. § 1379(a). This relationship between subsection (a) and subsection (b)(1) suggests that subsection (a) must preempt those types of laws and regulations that would be inconsistent with the criteria in subsection (b)(1). Otherwise, the criteria in subsection (b)(1) would have little import.[7]

Of particular importance to this case, the very first criterion in subsection (b)(1) requires states to have developed "a program for the conservation and management of [walruses] that ... is *consistent with the purposes, policies, and goals of this chapter.*" *Id.* § 1379(b)(1)(A) (emphasis added). As explained in Part A, the language, structure, and legislative history of the MMPA demonstrate that Congress intended to preempt any state law that relates to walrus taking and is inconsistent with the multiple objectives of the act. Because Congress specifically indicated that it balanced the need to protect mammals with the desire to recognize Native subsistence needs, I conclude that Congress's intent is sufficiently "clear and definite" to preempt the regulation at issue in this case.

Guided by the MMPA's language and legislative history and the United States Supreme Court's interpretation of preemption clauses similar to the one at issue in this case, I would interpret § 1379(a) to preempt 5 AAC 92.066 but to permit the State to enforce its general right to prevent trespass. Thus, I would affirm the court of appeals' decision.

---

**7.** This court has stated: "As a general rule, a 'statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Homer Elec. Ass'n. v. Towsley,* 841 P.2d 1042, 1045 (Alaska 1992) (quoting *Alascom, Inc. v. North Slope Borough, Bd. of Equalization,* 659 P.2d 1175, 1178 n. 5 (Alaska 1983)).