Denise **HAYNES**, decedent, by her successors in interest Senyah Haynes and A.L.H., a minor by his guardian ad Litem Donald Haynes, Senyah Haynes an adult; A.L.H. a minor, by his guardian ad Litem Donald Haynes, Plaintiff,

v.

**NATIONAL RAILROAD PASSENGER CORPORATION dba Amtrak,** Defendants.

No. CV 05–07696 DDP (EX).

United States District Court, C.D. California.

March 16, 2006.

1074

Danielle Leichner Casselman, Gary S. Casselman, Gary S. Casselman Law Offices, Los Angeles, CA, Richard Harris Frankel, Trial Lawyers for Public Justice, Washington, DC, for Plaintiff.

Michael Emmet Murphy, Selim Mounedji, Wayne R. Sims, Sims Law Firm, Newport Beach, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

PREGERSON, District Judge.

This matter is before the Court on the defendant's motion to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). After reviewing the papers submitted by the parties and hearing oral argument, the Court denies the motion in part and grants the motion in part.

### I. BACKGROUND

In July 2003, Denise Haynes and her son Adam Leander Haynes took an Amtrak train from Chicago to Los Angeles. Upon their arrival in Los Angeles, Denise Haynes allegedly began to experience head pain and breathing difficulties (Compl. ¶ 22.) Shortly thereafter, she lost consciousness and died. (*Id.* ¶ 22–23.) The autopsy determined the cause of death to be deep vein thrombosis ("DVT"). (*Id.*)

The plaintiffs in this action are the estate of Denise Haynes, Adam Haynes, and Denise's daughter Senyah Haynes. They filed an action against Amtrak in state court alleging that Amtrak violated common law and statutory duties of care that common carriers must show their passengers. The defendant removed the case to federal court and filed this motion to dismiss.

### II. DISCUSSION

#### A. *Legal Standard*

Dismissal under Federal Rule of Civil Procedure 12(b)(6) is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proved

consistent with the allegations." *Newman v. Universal Pictures,* 813 F.2d 1519, 1521–22 (9th Cir.1987) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Accordingly, the Court must "accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party." *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 923 (9th Cir.2001). However, the Court need not accept conclusory legal assertions as true. *Benson v. Ariz. State Bd. of Dental Exam'rs,* 673 F.2d 272, 275–76 (9th Cir.1982).

### B. Analysis

#### 1. Federal Preemption

The plaintiffs allege that dangerous seats and seating configurations in Amtrak trains along with Amtrak's failure to warn passengers about DVT caused Denise Haynes to suffer DVT and die. (Compl.1–5.) The plaintiffs assert that Amtrak had a duty to warn all passengers about the possibility of developing DVT from sitting in the seats on Amtrak trains and never moving. The defendant argues that the underlying duties that serve as the basis for the plaintiffs' claims are all preempted by federal law.

#### a. Background

The origins of preemption are found in the Supremacy Clause of the United States Constitution. U.S. Const. art VI, cl.2. This Constitutional provision explains that the laws of the federal government take precedence over state laws on the same matter and in effect invalidate state laws when they conflict with federal law.

There are two main prongs of preemption analysis. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). First, the Court examines the federal statute in question to see if the law contains an express preemption provision. *See id.* Express preemption analysis involves using statutory interpretation techniques to determine the extent of preemption described by the clause. *See Aetna Health Inc. v. Davila,* 542 U.S. 200, 217, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004). If there is no express provision, the Court looks for implied preemption. *See Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

Implied preemption takes two forms: field preemption and conflict preemption. *See Freightliner Corp. v. Myrick,* 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). In field preemption, a federal regulation is so pervasive that it occupies an entire field and allows for no state action in the area. *English v. Gen. Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Conflict preemption looks at whether the state law makes it either impossible to follow the federal law or provides a significant obstacle to adhering to the federal law. *Freightliner,* 514 U.S. at 287, 115 S.Ct. 1483.

There are also two prongs to conflict preemption analysis: impossibility and obstacle. *Id.* When a state law makes it impossible to comply with a federal law, there is a clear conflict between the two and the state law is preempted. *Id.* The other branch of conflict preemption involves state laws that "prevent or frustrate the accomplishment of a federal objective." *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000). Federal law thus preempts state law that "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *Id.* (citing *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)).

■ The Supreme Court has cautioned, however, that "despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). "Accordingly, the purpose of Congress is the ultimate touchstone of any preemption analysis." *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608 (citations omitted).

b. *The Amtrak Act, 49 U.S.C. § 24301*

Amtrak is regulated by Congress via, *inter alia,* the Amtrak Act, 49 U.S.C. § 24301 et seq. The Amtrak Act contains the following express preemption provision: "A State or other law related to rates, routes, or service does not apply to Amtrak in connection with rail passenger transportation." § 24301(g). In determining whether a state law is preempted by the Amtrak Act, the Court must examine whether that law "relates to" rates, routes, or service. "Rate" is defined to mean "a rate, fare or charge for rail transportation." § 24102(8).

Many express preemption clauses contain the phrase "relates to." Although there are no published federal cases discussing this phrase specifically in the context of the Amtrak Act, the Supreme Court has examined the phrase in other preemption contexts. In particular, the Supreme Court has often examined this phrase in the context of the Employee Retirement Income Security Act (ERISA) which preempts state laws that "relate to" ERISA benefit plans. *See, e.g., Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). In that context, the Supreme Court pointed

out that if "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for "really, universally, relations stop nowhere." *Travelers,* 514 U.S. at 655, 115 S.Ct. 1671.

■ The defendant argues that any duty to require Amtrak to equip its passenger cars with fewer seats spaced further apart would have a direct and forbidden effect on the fares Amtrak charges passengers and would thus directly relate to rates and service and therefore be expressly preempted by the Amtrak Act.

The defendants cite *In re: Deep Vein Thrombosis Litig.* ("*In re DVT*"), 2005 WL 591241, 2005 U.S. Dist. LEXIS 4043 (N.D.Cal.2005) (unpublished) (Walker, J.). In that case, the district court held that the Airline Deregulation Act (ADA) preempted the plaintiffs' defective seating configuration allegations. *Id.* at 2005 WL 591241, *14, 2005 U.S. Dist. LEXIS 4043, *49.

The ADA expressly preempts all state laws having the force and effect of law related to a price, route, or service of airline carriers. 49 U.S.C. § 41719(b)(1). The defendants argue that because the ADA express preemption provision is nearly identical to the Amtrak's Act preemption provision, this Court's findings should mirror those of the district court in *In re DVT*. (Mot.3.) In that case, the plaintiffs alleged that aircraft seating should be reconfigured to provide more leg room. *In re DVT,* 2005 WL 591241, *1, 2005 U.S. Dist. LEXIS at *10. The parties acknowledged that this would necessarily decrease the number of available seats on the aircraft which would in turn force the airlines to increase their prices. *Id.* at 2005 WL 591241, *8, 2005 U.S. Dist. LEXIS 4043, *30. The district court found that the effect would be an increase in airline ticket prices which the court held to be an indi-

rect state regulation of pricing expressly preempted by the ADA. *Id.* at 2005 WL 591241, *8, **9–10, 2005 U.S. Dist. LEXIS 4043, *30, *35.

Amtrak asserts that the current case is nearly identical to *In re DVT* because any alleged duty to provide more leg room would require it to equip its trains with fewer seats spaced further apart leading to a direct and forbidden effect on fares. (Mot.3–4.)

Both the Supreme Court and the Ninth Circuit have held that a state law does not relate to prices unless the law "acts immediately and exclusively upon price ... or the where the existence of a price ... is essential to the law's operation." *Air Transp. Ass'n v. City & County of San Francisco,* 266 F.3d 1064, 1071 (9th Cir. 2001) (citing *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997)).

In *Air Transport* the Ninth Circuit examined whether the ADA preempted a San Francisco anti-discrimination ordinance. *Id.* at 1068. The ordinance requires employers to provide the same benefits to registered domestic partners as they provide to spouses. *Id.* The airlines argued that this would increase their costs thereby increasing ticket prices, which they asserted would be an impermissible regulation of price and preempted by the ADA. *Id.* at 1072. The Ninth Circuit held that the ADA did not preempt the ordinance. *Id.* at 1072–73. The court explained that there was no specific textual reference to airfares. *Id.* at 1072. The fact that a local ordinance could lead to an

effect on price was not enough to preempt where the ordinance did not compel or bind the airlines to a specific course of action. *Id.* at 1071.

The Supreme Court has found however that the ADA preempts state laws where the state laws specifically addressed prices of airline tickets and how those prices are advertised. *Morales v. Trans World Airlines,* 504 U.S. 374, 387–88, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992).

The California claims brought by the plaintiffs are not laws that work to regulate Amtrak's rates directly. Although the state law may result in increased costs leading to higher rates, that is not necessarily the result.[1]

There must be limits to preemption under the Amtrak Act. Congress did not intend to preempt all state tort law claims. Following the defendant's argument, any law leading to increased costs would necessarily lead to increased rates and therefore be preempted by the Amtrak Act. Congress intended rates to be interpreted narrowly. A similar issue arose in the context of the ADA. In *Charas v. Trans World Airlines, Inc.,* the Ninth Circuit interpreted the term "service" narrowly explaining that to do otherwise "would result in the preemption of virtually everything an airline does." 160 F.3d 1259, 1265–66 (9th Cir.1998). Similarly, nearly any regulation or common law tort claim has the potential to affect Amtrak's rates. *Accord Duncan v. Northwest Airlines, Inc.,* 208 F.3d 1112, 1115 (9th Cir.2000) (holding that increased economic costs to airlines do not justify preemption, explaining that all torts suits

1. Plaintiffs success on their claims *could* affect Amtrak's rates. If a jury were to find that Amtrak was negligent in choosing and arranging seats, the company would be on notice that it needs to change its operations. This could arguably require Amtrak to change or reduce seats leading to increased costs. However, it is far from clear that this would be the result of the case. Even if a jury were to find Amtrak negligent, seat changes might not be required. As the plaintiffs have pointed out, Amtrak could reduce the risk of DVT via other actions like providing water or warnings. (Opp'n 23–24.)

"invariably carry with them an economic cost for the defendant.")

■ Additionally, the text of the Amtrak Act demonstrates that Congress did not intend to preempt all tort claims imposing costs on Amtrak. For example, section 28103(c) requires Amtrak to maintain liability insurance coverage of at least $200 million to handle claims brought by passengers. The text of the act shows that Congress contemplated tort claims imposing costs on the company. Because the state law does not mandate an outcome that would affect rates, it is not preempted by the Amtrak Act. The plaintiffs' claims do not "relate to" rates and therefore are not preempted by the Amtrak Act.

c. *Federal Railroad Safety Act (FRSA), 49 U.S.C. 20101 et seq.*

The defendant also argues that the FRSA expressly preempts the plaintiffs' common law claims. The FRSA express preemption provision states:

Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—

(1) is necessary to eliminate or reduce an essentially local safety or security hazard;

(2) is not incompatible with a law, regulation, or order of the United States Government; and

(3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

■ This express preemption provision contains a savings clause acknowledging that state regulation in this realm is permitted in certain circumstances. *Id.* First, a state may adopt or continue to enforce a law that covers subject matter not already covered by federal regulations or orders. *Id.* Second, a state may enact or continue to enforce laws on a subject matter covered by federal regulations if that law meets three criteria (1) it is necessary to eliminate or reduce a local safety or security hazard, (2) it is compatible with the federal law, and (3) it does not necessarily burden state commerce. *Id.*

The Ninth Circuit has held that "FRSA preemption is even more disfavored than preemption generally." *S. Pac. Transp. Co v. Pub. Util. Comm'n.*, 9 F.3d 807, 813 (9th Cir.1993). This follows the Supreme Court's opinion in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). There, the Supreme Court explained the presumption against FRSA preemption:

To prevail on the claim that the regulations have pre-emptive effect, petitioner must establish more than that they "touch upon" or "relate to" that subject matter, for "covering" is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law. The term "covering" is in turn employed within a provision that displays considerable solicitude for state law in that its express pre-emption clause is both prefaced and succeeded by express saving clauses.

*Id.* at 664–65, 113 S.Ct. 1732 (citations omitted).

The plaintiffs argue that their claims are covered by the first part of the savings clause because the state laws upon which they make their claims are not of a subject matter already regulated by either the Secretary of Transportation or the Secretary of Homeland Security. Therefore, they contend that their claims are not preempted by the FRSA.

If the state laws at issue do fall under a subject matter already regulated by the federal government, then the claims will be preempted absent a showing that they fall under the second category outlined by the savings clause. Thus, the essential question is determining the subject matter of the state laws at issue. The Court examines the claims based on seats and seat configuration separately from the claims asserting a failure to warn.

#### i. *Seats and Seat Configuration*

■ There are federal regulations addressing the subject matter of seats on passenger trains. The Secretary of Transportation has promulgated "Passenger Equipment Safety Standards" that cover the subject matter of safe passenger seats and crew member seats. These regulations work to "prevent collisions, derailments, and other occurrences involving railroad passenger equipment that cause injury or death to railroad employees, railroad passengers, or the general public; and to mitigate the consequences of such occurrences to the extent they cannot be prevented.... This part prescribes minimum Federal safety standards for railroad passenger equipment." 49 C.F.R. § 238.1(a) & (b) (2002).

The regulations further outline rules for seats in 49 C.F.R. part 238.233 (explaining how seats must be fastened to the car body and what types of load the seats must be able to withstand). The federal government also regulates the inspection of train seats. 49 C.F.R. §§ 238.307(d) & 238.447(f).

The defendant contends that these regulations cover both seats and their configuration. While the plaintiffs acknowledge that the federal government has regulated seats on trains, they contend that these regulations do not substantially subsume the subject matter of "space between seats." (Opp'n 11.) The regulations relied upon by the defendant govern seat safety for circumstances involving train crashes and broken seats. There is no discussion in the regulations of leg room, seat pitch, or ensuring that seats do not contribute to discomfort or illnesses like DVT. The Court finds that there are no federal safety or security regulations that substantially subsume state tort actions regarding potential of DVT from poorly designed seats or seating arrangements.

#### ii. *Warnings*

■ The plaintiffs' claims are also based on a duty to warn passengers about DVT. There do not appear to be any regulations in this area. There are federal regulations regarding passenger safety on trains in emergency situations. *See, e.g.,* Passenger Train Emergency Preparedness, 63 Fed.Reg. 24,630 (May 4, 1998). DVT, however arises in non-emergency situations. The Ninth Circuit has distinguished safety risks arising from unusual circumstances and normal circumstances. *Rodriguez v. Ansett Australia Ltd.,* 383 F.3d 914, 916–17 (9th Cir.2004). The FRSA's emergency safety plans do not subsume the subject matter of DVT warnings.

#### d. *Commerce Clause*

■ The Commerce Clause gives Congress the power to "Regulate Commerce with foreign Nations and among the sever-

al States." U.S. Const. art. I, § 8, cl. 3. State laws that impermissibly burden interstate commerce are preempted. The defendant's arguments regarding the Commerce Clause are of the type labeled "Dormant Commerce Clause." The Dormant Commerce Clause prevents states from jeopardizing the welfare of the nation as a whole by placing burdens on flow of commerce across borders that commerce wholly within those borders would not bear. Const. Art. 1, § 8, cl. 3. *See Am. Trucking Ass'ns, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005).

■■■■■ "Absent such congressional approval, a state law may violate the unwritten rules described as the 'dormant Commerce Clause' either by imposing an undue burden on both out-of-state and local producers engaged in interstate activities or by treating out-of-state producers less favorably than their local competitors." *Granholm v. Heald*, 544 U.S. 460, 125 S.Ct. 1885, 1907, 161 L.Ed.2d 796 (2005).

Congress, in enacting legislation within its constitutional authority over interstate commerce, will not be deemed to have intended to strike down a state statute designed to protect the health and safety of the public unless its purpose to do so is clearly manifested, or unless the state law, in terms or in its practical administration, conflicts with the Act of Congress, or plainly and palpably infringes its policy.

*S. Pac. Co. v. Arizona*, 325 U.S. 761, 766, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)

■■■■■ "Although the commerce clause conferred on the national government power to regulate commerce, its possession of the power does not exclude all state power of regulation." *Id.* In the absence of conflicting legislation by Congress, states have the power to make laws governing matters of local concern which nevertheless in some measure affect interstate com-

merce or even, to some extent, regulate it. *Minnesota Rate Cases (Simpson v. Shepard)*, 230 U.S. 352, 399–400, 33 S.Ct. 729, 57 L.Ed. 1511 (1913).

The defendant argues that the current claims should be preempted by the Commerce Clause because it would be burdensome on railways to permit differing state regulations regarding warnings and train seating. The plaintiffs argue that the state claims are not preempted because the claims are based on health and safety laws that do not unreasonably burden interstate commerce. (Opp'n 13.) The plaintiffs argue that the state laws do not impose a burden that is clearly excessive in relation to the putative local benefits. (*Id.* at 15.) Again, the Court examines claims regarding seats separately from claims regarding warnings.

### i. *Seats and Seat Configurations*

■■■■■ State laws regarding seats and/or seating configurations on trains are preempted by federal law. As described above, federal laws and regulations describe rules regarding passenger seats on trains. Although these rules do not specifically address seat pitch, it would be unduly burdensome on interstate commerce and the passenger train industry to require differing standards regarding passenger seats. Such an allowance could lead to varying state requirements regarding leg room, for instance. It would be impracticable for trains to change seating arrangements as they crossed state boundaries.

The plaintiffs argue that because Congress explicitly acknowledged the right of states to regulate interstate commerce in this realm via statute, dormant Commerce Clause principles should not be held to prohibit this case. By explicitly defining the realms of state and federal regulation in the FRSA, Congress acknowledged the ability of states to regulate railroads in a

way that may burden commerce. Further, because the plaintiffs are seeking damages instead of a specific reconfiguration of the seats, they argue that the Court should not find their claims preempted. Courts have noted that interstate businesses run the risk of being subject to varying jury verdicts, but such a possibility does not preempt the underlying cases. *Bates v. Dow Agrosciences,* 544 U.S. 431, 125 S.Ct. 1788, 1802–03, 161 L.Ed.2d 687 (2005).

The plaintiffs also argue that courts have never used the Commerce Clause to invalidate common law claims. However, this is not true. The Third Circuit has explained that "[l]iability in tort imposed under state common law principles is subject to pre-emption ... whenever those common law principles conflict with federal statutory or regulatory law." *Buzzard v. Roadrunner Trucking,* 966 F.2d 777, 779 (3d Cir.1992); *see also San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 246–49, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959).

█ Even though the plaintiffs are seeking damages instead of an injunction, a jury verdict finding Amtrak's current amount of leg room inadequate would put the company on notice that it would have to change its seat configurations.[2] Conflicting jury verdicts on this question would have a direct effect on the trains and create a significant burden on interstate passenger train travel. Thus, the Court finds preemption of the plaintiffs' claims regarding seats and seating configurations based on the Commerce Clause.

ii. *Warnings*

█ A duty to warn passengers is not unduly burdensome on commerce. *See Gerling Global Reinsurance Corp. v. Low,* 240 F.3d 739 (9th Cir.2001). Although there is a potential of differing state laws

regarding warnings to passengers, it is unlikely that these laws would vary greatly. A duty to warn passengers of the danger of DVT would generally need to explain the disease, explain that it is life threatening, and detail the precautions passengers could take to prevent DVT. It is unlikely that notice requirements would differ between jurisdictions because the notice would be a relatively simple, straightforward notice. The Commerce Clause does not preempt state claims regarding notice.

e. *Interstate Commerce Commission Termination Act (ICCTA), 49 U.S.C. § 10101 et seq.*

█ This statute vests the federal Surface Transportation Board with exclusive jurisdiction over railroad operations and preempts any state law claims over matters falling within the STB's jurisdiction. This statute does not preempt the plaintiffs' claims because the preemption provision does not apply to railroad safety claims which are instead governed by FRSA.

2. *Products Liability*

█ In their products liability cause of action, the plaintiffs allege that the train seats and seating configuration were defective because they created the likely result of DVT. (Compl.¶ 50.) The plaintiffs allege that Amtrak knew or should have known that passengers would use the seats and seating configuration without inspecting them for this defect. (*Id.* ¶ 53.) Strict liability applies to inadequate warnings or failures to warn. *Anderson v. Owens–Corning Fiberglas Corp.,* 53 Cal.3d 987, 1000, 281 Cal.Rptr. 528, 810 P.2d 549 (1991).

---

**2.** At this point in the litigation, it is not clear whether a change in seats or seating configurations would be acquired. However, to the extent that the plaintiffs base their clams on faulty seating and configurations, those claims are preempted.

The defendant argues that the Court should dismiss the plaintiffs' products liability claim because Amtrak, as a provider of transportation services, cannot be held liable on a strict products liability theory. (Mot.16.) "Courts have not extended the doctrine of strict liability to transactions whose primary objective is obtaining services." *Ferrari v. Grand Canyon Dories,* 32 Cal.App.4th 248, 257, 38 Cal.Rptr.2d 65 (1995) (quoting *Pierson v. Sharp Mem. Hosp., Inc.,* 216 Cal.App.3d 340, 344, 264 Cal.Rptr. 673 (1989)).

The plaintiffs argue that the defendant may be held liable under a strict products liability theory because Amtrak provides both a service and a product. (Opp'n 29–30.) In support, the plaintiffs cite two California cases. In *Pierce v. Pac. Gas & Elec. Co.,* 166 Cal.App.3d 68, 212 Cal.Rptr. 283 (1985), the plaintiff suffered an electric shock in her home as the result of a defective transformer. The court held that the electricity supplied by PG & E constituted a product and held the company liable under a strict liability theory. *Id.* at 82–83, 212 Cal.Rptr. 283. The court did not, as the plaintiffs contend, hold that electricity is both a product and a service.

In *Garcia v. Halsett,* 3 Cal.App.3d 319, 82 Cal.Rptr. 420 (1970), the plaintiff suffered injury from an allegedly defective washing machine at a laundromat. The court concluded that, while the laundromat operator was "not engaged in the distribution of a product, in the same manner as a manufacturer, retailer, or lessor … [the laundromat operator] does provide the product to the public for use by the public." *Id.* at 326, 82 Cal.Rptr. 420.

The facts in this case are distinguishable from *Garcia.* The defendant did not just provide the decedent with a seat to use, rather, it provided the decedent with transportation services from Chicago to Los Angeles, and the use of the seats was incidental to those services. *See Pierson v. Sharp Mem'l Hosp., Inc.,* 216 Cal. App.3d 340, 346–47, 264 Cal.Rptr. 673 (1989) (hospital that contained a room with allegedly defective carpeting could not be held liable under strict product liability because it supplied medical services, and the room with the carpeting was an "integral component" of providing those services). The Court finds that Amtrak provides a service, even though its trains contain seats as part of providing that service. *See Murphy v. E.R. Squibb & Sons,* 40 Cal.3d 672, 677–78, 221 Cal. Rptr. 447, 710 P.2d 247 (1985) (pharmacist who supplied defective drugs could not be held liable under strict product liability because he provided a service, even though he sold the drugs as part of providing that service). The seats are provided for customers, but the service is the transportation; the defendant is not providing a product in the form of seats. Accordingly, the Court dismisses the fourth cause of action with prejudice.

### 3. *Infliction of Emotional Distress*

In their cause of action for intentional infliction of emotional distress, the plaintiffs allege that the defendant was aware of the propensity of its seats and seating configurations to cause DVT. (Compl.¶¶ 65–66.) The plaintiffs allege that the defendant willingly and maliciously refused to disclose the information to the public. (*Id.* ¶¶ 66–69.) The plaintiffs further allege that they have suffered severe emotional distress as a result of the defendant's alleged outrageous conduct. (*Id.* ¶ 71.)

"A cause of action for intentional infliction of emotional distress must allege facts showing outrageous conduct which is intentional or reckless and which is outside the bounds of decency." *Ochoa v. Superior Court,* 39 Cal.3d 159, 165 n. 5, 216 Cal.Rptr. 661, 703 P.2d 1 (1985). The

defendant argues that the Court should dismiss the plaintiffs' claim because they have failed to allege facts sufficient to support their allegation that the defendant's conduct was extreme and outrageous. (Mot.20.) [3] Outrageous conduct is defined as "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Cochran v. Cochran,* 65 Cal.App.4th 488, 494, 76 Cal.Rptr.2d 540 (1998). The plaintiffs argue that the defendant's alleged failure to disclose information about DVT constitutes outrageous conduct.[4] (Opp'n 30.) The Court finds, however, that the plaintiffs' do not allege facts showing how the defendant's conduct falls outside the bounds of decency. Therefore, the Court dismisses the intentional infliction of emotional distress cause of action.

### 4. *Punitive Damages*

■ The defendant also argues that the plaintiffs cannot state a claim for punitive damages because punitive damages are not recoverable in a wrongful death action.

The Amtrak Act addresses when punitive damages may be awarded against Amtrak stating that there must be "clear and convincing evidence that the harm that is the subject of the action was the result of conduct carried out by the defendant with a conscious, flagrant indifference to the rights or safety of others." 49 U.S.C. § 28103(a)(1). The statute then explains that any punitive damages that may be awarded must follow state law rules regarding damages. *Id.*

California law limits recovery in wrongful death actions to "the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." Cal. Code of Civil Procedure § 377.34.

California law does permit some punitive damages in wrongful death actions. To merit an award of damages, the plaintiffs must show that Amtrak's conduct was carried out with a "conscious, flagrant indifference to the rights or safety of others." 49 U.S.C. § 28103. The plaintiffs allege that Amtrak was fully aware of the threat of DVT and refused to warn passengers. The plaintiffs contend that Amtrak acted willingly and maliciously. (Compl.11.) The Court finds that the plaintiffs have adequately stated a claim for punitive damages and declines to dismiss the punitive damages claim under FRCP 12(b)(6).

■ The defendants also argue that the plaintiffs' claims for punitive damages must fail because punitive damages in cases of first impression are inappropriate. (Mot.24.) However, imposition of punitive damages against a common carrier for breach of its duty to passengers is not a novel legal theory or a question of first impression. *See, e.g., Mendelsohn v. Anaheim,* 40 Cal. 657 (1871). The Court finds that the plaintiffs have adequately pled a claim for punitive damages and declines to dismiss on these grounds.

### III. CONCLUSION

For the foregoing reasons, the Court grants the motion to dismiss based on preemption as the claims relate to seats and seat configurations. However, the Court denies the motion to dismiss claims

---

**3.** The defendant also argues that the plaintiffs fail to adequately state a claim for negligent infliction of emotional distress, however, the plaintiffs do not allege this cause of action in their complaint.

**4.** The cases cited by the plaintiffs involve claims for negligent infliction of emotional distress.

regarding warnings. Further, the Court dismisses the plaintiffs' claim of products liability with prejudice and the claim of intentional infliction of emotional distress without prejudice. The Court denies the motion to dismiss the prayer for punitive damages. The plaintiffs have twenty (20) days to file an amended complaint.

IT IS SO ORDERED.